THE CITY OF WHEELING, *A Municipal Corporation v.*
BENWOOD-MCMECHEN WATER COMPANY, *A Corporation*

(CC 509)

Submitted September 11, 1934. Decided September 25,
1934.

354

*O'Brien & O'Brien* and *McCamic & Clarke,* for plaintiff.

*Miller, Thompson & Dunbar, Austin V. Wood, Koontz, Hurlbutt & Revercomb* and *W. Elliott Nefflen,* for defendant.

HATCHER, JUDGE:

The City of Wheeling owns a water plant, and since 1927 has furnished water to a public utility, the Benwood-McMechen Water Company (hereinafter usually referred to as the company). The water is delivered by the city to the main of the company at a place within the city, and is metered at the place of delivery. Then the company, through its own facilities, distributes the water to its customers in the municipalities of Benwood and McMechen. The city charges its consumers higher rates for water service outside than inside the municipal limits. Until 1930 the city billed and was paid by the company for the water furnished at *intra* city rates. Since 1930 the city has demanded payment at the *extra* city rates. The company has refused the demand and has continued to pay at the *intra* city rates. This action was brought in 1933 by the city to recover the difference between the sum it demanded and the sum the company paid. (The difference amounted on May 31, 1933, to $19,239.59.) The company set up its defense by a special plea. The circuit court sustained a demurrer to the plea and (in 1934) certified here its sufficiency.

The city takes the position that an order of the Public Service Commission made December 31, 1929, authoriz-ing a rate increase, abrogated the arrangement thereto-fore existing between it and the company. The city contends that sale of water for outside use is in effect an outside sale despite physical delivery of the water within the city. That contention, it maintains, is supported by the fact that the pressure exerted on the water at the place of delivery carries the water through the mains and pipes of the company to its customers.

The company takes the position that since the order of the commission merely authorized an increase of rates both inside and outside the city, the order did not abro-gate the existing contract; and that the company has conformed to the order by paying the increased inside rate. The company contends that since the dominion of the city over the water ends with delivery (inside the city) and the company's liability for and dominion over the water begins with that delivery, the place of delivery fixes the rate despite outside use. Concerning the water pressure, the company replies that the water furnished it is under no greater pressure than the water furnished others inside the city; that such pressure is an integral part of the water service; and that pressure alone has no bearing on the question of delivery.

The following facts are alleged in the pleadings: On complaint that the water service of the company had be-come unsatisfactory, the Public Service Commission of West Virginia, on September 7, 1927, directed the com-pany "to undertake to procure from the city of Wheeling a supply of healthful water and serve the same to its customers." Pursuant to that order, a representative of the company conferred with the council and the city manager of the plaintiff, the chief engineer of the com-mission being present. At that conference an arrange-ment was made between the company and the city, evi-denced by an exchange of letters. The one from the city to the company dated September 21, 1927, is as follows:

"Pursuant to the action of the City Council

of the City of Wheeling in executive session Tuesday, September 20th, 1927, the City of Wheeling hereby agrees to furnish water to the Benwood-McMechen Consolidated Water Co. of Benwood, W. Va. for a period of 60 days from date. Point of delivery, present meter located at city limits, 48th Street, Wheeling.

The City of Wheeling agrees to make daily readings of meter, and further agrees to furnish this service at the regular schedule of rates as now in effect in the City of Wheeling.

The Schedule of meter rates now in effect and to apply on this agreement is as follows:
(Here follows the several rates according to quantity)
Kindly acknowledge acceptance and oblige,
Yours very truly,
(signed) Chas. O. Ephlin
City Manager."

The company acknowledged the city's letter on September 24th, and advised further:

"* * * it was our understanding also that if the City of Wheeling experiences no particular operating difficulties in furnishing this service over a period of sixty days, as mentioned above, that it would be agreeable to them to enter into a contract for furnishing our Company water at the same rate over a period of time, which contract would be subject to the approval of the Public Service Commission of the State of West Virginia. We mention this latter matter in that the Public Service Commission has asked for a report on the test which we are undertaking to make, and we will have them advised as mentioned above unless you feel that our interpretation of the action taken by Council in this matter did not provide for an understanding of this kind."

No written answer was made to the company's letter, but the temporary arrangement (in the language of the plea) "was mutually advantageous to both parties." On December 1, 1927, an order was entered by the commission which, after reciting the above agreement between

the company and the city and that the operating expenses of the company had been increased thereby approximately $1,200.00 a month, authorized the company to surcharge its rates for service twenty-five per cent. This surcharge was reduced by the commission on December 22, 1927, to ten per cent. There has been no later change in the rates of the company.

. The temporary agreement of September 21-24, 1927, was extended without innovation until October 26, 1928, when another writing was executed. The pleading of the plaintiff treats this later writing as the only contract in the case. The plea of defendant terms it "a formal agreement". It is copied into the pleadings; so we ourselves may determine its character and effect, irrespective of the allegations. (See generally *Lockhead* v. *Co.*, 40 W. Va. 553, 21 S. E. 1031; *Caswell* v. *Caswell*, 84 W. Va. 575, 100 S. E. 482; *Newberry L. Co.* v. *Newberry*, 95 Va. 119, 27 S. E. 899.) It consists of a single sheet of paper, printed on both sides. On one side is simply an application, signed by the company, for metered water service at 48th and Eoff Street in the city of Wheeling (the identical place mentioned and treated as an inside delivery in the first agreement), the company agreeing to pay for water delivered to "the premises above named" at the city's "published rates". (This phrase throws no light on the issue, since the published rates embrace both the inside and outside rates.) One H. S. Quigley purports to sign the application "For Water Department" (presumably of the city) but any obligation assumed by the city must be implied, as none is expressed. The application introduces no new understanding between the parties. It makes no mention of water pressure, or of the customers of the company, or of the status of the latter as a public utility, or of the classification of the service, or of the duration of the contract. It contains no terms whatever indicating that it was to be taken as the whole agreement. On the other side of the sheet are the rules and regulations governing "water service in the city of Wheeling."

. The instrument of October 26, 1928, conforms to none

of the definitions of a formal contract. See Williston on Contracts, sec. 4; Clark, *idem,* sec. 27; Restatement of the Law of Contracts, sec. 7. That instrument is even more informal than the agreement of September 21-24, 1927, and does not *in itself* necessarily merge or extinguish the earlier agreement. 13 C. J. subject Contracts, sec. 617. On the other hand, informality alone will not prevent the integration of a contract. Williston, *supra,* sec. 633. But where a later writing omits essential terms which were stipulated in a preliminary agreement, the contract is only *partially integrated.* In such case, the omitted terms of the prior engagement are not invalidated or superseded by the later. Restatement, *supra,* sec. 229 and 240. Since the printed application herein does not specify the rates to be paid or otherwise classify the company, the application is incomplete on its face. At most, it is only a partial integration of the contract. Williston, *supra,* sec. 633 (pp. 1226-7). Accordingly, we hold that the stipulation of September 21-24, 1927, to furnish the service at the inside rates, was not affected by the later agreement. Both parties, themselves, initially placed this construction on their arrangement. Their relations underwent no change after October 26, 1928. The city continued to bill and the company to pay at the inside rates for more than a year thereafter. Their conduct indicates that they regarded the writing of October 26, 1928, more as a confirmation of their earlier agreement than as an integration of the contract. The standard of interpretation of an integration set up in Restatement, *supra,* section 230, is the meaning that would be attached thereto by "a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration." That standard is furnished by the practical construction of the parties. Our construction conforms to that standard.

Counsel for the city contend that certain definitions of the word "consumer" appearing in the printed rules (on the back of the application sheet) demonstrate that the classification of the service depends on whether the

ultimate use of the water is inside or outside the city. But those definitions and the rules as a whole are patently designed to apply to domestic and industrial consumers of the city. For example, one of the rules is: "Consumers will not be permitted to supply water to any premises other than that mentioned in the application, agreement or contract without permission from the city." No such permission appears on the application sheet; yet the whole purpose of the company, well known to the city, was to supply water as a public utility to premises other than 48th and Eoff Streets. So the printed rules and their definitions have little, if any, pertinency to the issue herein.

The initial classification of the service by the city council as *inside service* was fixed in the presence of a representative of the commission (its chief engineer) and had at least its tacit approval. That classification is not strained or artificial. Both the title to and the physical possession of the water were transferred to the company within the city. Every duty and expense of the city ended at 48th and Eoff Streets. There, the water passed from the city's main to that of the company and was placed completely and unconditionally at the disposal of the company. That was a delivery recognized by law. "It may be said to be the general rule that as between the parties themselves the goods are delivered whenever at the time and place * * * the parties have agreed upon, the seller has done everything which is necessary to be done in order to put the goods completely and unconditionally at the disposal of the buyer." Mechem on Sales, section 1186. Accord: *Fickeisen* v. *Company,* 67 W. Va. 335, 336-7-8, 67 S. E. 788.

In assuming the role of a vendor of water for profit, the city does not act in its legislative or governmental capacity, but as a plain business concern. *Wigal* v. *Parkersburg,* 74 W. Va. 25, 81 S. E. 554; McQuillin, Mun. Corporations (2nd Ed.), sec. 1946. As such concern, the city is governed by the same rules and regulations which govern other corporations in the same business. Pond, Public Utilities, sec. 199. Being a public utility the city

is subject to the supervision of the Public Service Commission. The brief of the city admits such subjection, referring to Code 1931, 24-2-1, 2 and 5. Despite the fact that no duration is fixed to the contract herein, the city could not relieve itself from the terms of the contract under the general law, except upon reasonable notice. Pond, *supra,* 201. "A public service corporation cannot arbitrarily cease to do that which the public is rightly depending on it to do." *Gassaway* v. *Gas Co.,* 75 W. Va. 60, 61, 83 S. E. 189. Under Code 1931, 24-2-4 (Code 1923, ch. 15-0, section 9) the city could not change an established rate or classification "except after thirty days' notice to the commission and the public." That notice was not given. Since any increase resulting from a change in classification would naturally be passed on by the company to its patrons, the public would be concerned. Because of such public interest, the statute clearly applies. Consequently, we are of opinion that the city could not change the classification arbitrarily but only in manner provided by the statute.

We agree with counsel for the company that the order of the commission made December 31, 1929, merely authorizing the city to raise both inside and outside rates, did not change the original agreement between the parties, except as to the increase (which the company met).

The brief of the city iterates the statement that the law does not authorize the taxation of its citizens to build water works for the benefit of the inhabitants of Benwood and McMechen. Certainly not, but the statement is beside the issue. There is no allegation that the city has lost money at the inside rates received for the water distributed by the company in Benwood and McMechen. To the contrary the plea of the company alleges that the temporary arrangement (inside rates) was advantageous to the city. In its charter the city was granted the right "to sell water * * * to persons or corporations outside as well as within the limits of the city." See Acts 1915, Municipal Charters, chapter 21, section 20. It may be that outside service is placed thus on a parity with inside service because the charter conferred on the city

the power of eminent domain outside of the city in connection with its water system. However that may be, no distinction is drawn in the charter between an outside and an inside service. The higher rates for outside service were evidently permitted by the commission to reimburse the city for the additional expenses incurred in the outside service, and not to permit the city to increase its profits when no such expenses are incurred merely because the service is outside. Any other justification for the higher rate is not apparent.

The brief for the city bases one of its arguments on the postulate that the service rendered the company was optional with the city. Since the service by the city is that of a public utility, chartered alike for service both inside and outside the city, we are not prepared at present to accept that assumption, and it is needless to set forth that argument. "As long as a public service corporation retains a franchise, it must fulfill the obligations to the public directly or impliedly arising from the same." *Gassaway* v. *Gas Co., supra.*

The brief challenges the authority of the city manager to write the letter of September 21, 1927. His authority is not properly an issue upon this demurrer. The plea alleges that at the conference in September, 1927, between the company, the chief engineer of the commission and the city manager and city council "pursuant to the action of said council the said plaintiff did then and there enter into a contract with defendant to sell defendant water to be supplied by defendant to its customers as aforesaid which contract was set forth in two certain letters as follows." The letter signed by the city manager and the company's reply then follow in the plea. Upon demurrer the agreement stated in the letters must be taken to be *the agreement of the city itself,* and not that of the manager.

The brief contends that the arrangement of September 21-24, 1927, is against public policy. But as that contention is based upon the assumption that the delivery of water is an outside delivery, and we do not agree

to the assumption, further comment on the contention is unnecessary.

We are of opinion that the company's plea presents a valid defense, and reverse the ruling of the circuit court.

*Reversed.*