IN THE MATTER OF THE FORMAL COMPLAINT OF THE BOROUGH OF GLEN ROCK AGAINST THE VILLAGE OF RIDGEWOOD IN RE WATER RATES ALLEGEDLY ESTABLISHED BY ORDINANCE No. 1136 OF THE VILLAGE OF RIDGEWOOD.

Argued October 7, 1957—Decided October 24, 1957.

*Mr. George Winne* argued the cause for appellant Borough of Glen Rock.

*Mr. William E. Reinhardt* argued the cause for respondent Village of Ridgewood.

*Mr. Howard Rosen* argued the cause for respondent Board of Public Utility Commissioners.

The opinion of the court was delivered by

WACHENFELD, J.   In 1921 the Village of Ridgewood purchased the Bergen Aqueduct Company, a privately owned public utility supplying water to the inhabitants of the Borough of Glen Rock as well as to those of Ridgewood. Since then, Ridgewood has continued to furnish residents of Glen Rock with water from its municipal facilities.   From 1921 until 1955, Ridgewood made no increases in its charges to individual consumers.   On November 8, 1955, however, it adopted an ordinance providing for rate increases to become effective as of January 1, 1956.   They were the same for users in both municipalities.

The officials of Glen Rock objected to the proposed rates, and since a compromise was not forthcoming, they filed a complaint with the Board of Public Utility Commissioners alleging the increases were arbitrary and discriminatory and should be set aside. The Board was asked to determine fair and reasonable rates.

Instead of deciding the dispute on its merits, the Board dismissed the complaint of Glen Rock, concluding it had no jurisdiction to regulate the rates charged by a municipally owned water utility even when that utility furnished water to consumers in an adjoining community. The Board also declined to arbitrate the dispute pursuant to the terms of an agreement between the Borough of Glen Rock and the Glen Rock Water Works, Inc., a corporation subsequently consolidated with the Bergen Aqueduct Company, which the Borough maintained was binding on the Village of Ridgewood as the successor to the Aqueduct Company.

Glen Rock appealed to the Appellate Division under *R. R.* 4:88–8, but before the appeal could be heard below we certified the cause on our own motion.

Appellant relies on a goodly number of statutory provisions to support its contention that the Board has jurisdiction in the premises, and we will consider them individually. Nevertheless, it must be borne in mind that a comprehensive understanding of the chronology and interrelationships among these various statutes is important in endeavoring to ascertain the legislative intent.

Glen Rock first refers us to *R. S.* 48:2–13, which was enacted in 1911 and outlines the general jurisdiction of the Board of Public Utility Commissioners. This section states the Board shall have "general supervision and regulation of and jurisdiction and control over all public utilities," and proceeds to define a "public utility" as any "individual, copartnership, association, corporation or joint stock company, their lessees, trustees or receivers appointed by any court whatsoever, that now or hereafter may own, operate, manage or control within this state any * * * water * * * system * * * under privileges granted or

hereafter to be granted by this state or any political subdivision thereof." Appellant argues that municipal corporations are embraced by the term "corporation."

We conceive from the context in which the word is used that it applies only to private corporations. A municipal corporation is of an entirely different nature, and it is probable that the Legislature would have expressly specified municipal corporations if it had intended to give the Board jurisdiction over them. The record indisputably discloses that over a period of 46 years the Board has consistently declined to regulate water rates charged by a municipality, and its administrative interpretation is entitled to great weight if there be any ambiguity in the statute under which it operates. *Lane v. Holderman,* 23 *N. J.* 304 (1957); *State Dept. of Civil Service v. Clark,* 15 *N. J.* 334 (1954); *Swede v. City of Clifton,* 39 *N. J. Super.* 336 (*App. Div.*), affirmed 22 *N. J.* 303 (1956); *Kaske v. State,* 34 *N. J. Super.* 222 (*App. Div.* 1955); *Walsh v. Dept. of Civil Service,* 32 *N. J. Super.* 39 (*App. Div.* 1954). One hundred and twenty-three municipalities throughout the State operate their own water supply systems and have never been subjected to administrative regulation. Rate-making is a prodigious task, and we are unwilling to impose this enormous burden upon the Board without an unequivocal declaration by the Legislature expressly so stating.

Glen Rock insists we can find such a declaration in *R. S.* 40:62–24, a section of the Home Rule Act adopted in 1917, which reads:

"Every municipality in supplying electricity, gas, steam *or other product* beyond its corporate limits is hereby declared to be a public utility. The board of public utility commissioners shall have the same supervision and regulation of, and jurisdiction and control over such municipality in respect to its acts in supplying electricity, gas, steam *or other product* beyond its corporate limits, and of and over the property, property rights, equipment, facilities and franchises used in supplying electricity, gas, steam *or other product* beyond its corporate limits as over other public utilities. Every such municipality shall be subject as to its * * * rates * * * to the jurisdiction of the board of public utility commissioners to the same extent as other public utilities." (Emphasis supplied)

Returning for the moment to consider *R. S.* 48:2–13 and the argument that municipal corporations operating utilities are included thereunder, we note that if this contention were valid there was no need to enact *R. S.* 40:62–24 in 1917. *R. S.* 48:2–13, adopted six years previously, applies to a "corporation" supplying "gas, electric light, heat [and] power," as well as water, and if "corporation" as used therein were intended to cover municipal corporations, the Board would already have had the jurisdiction purportedly conferred for the first time by *R. S.* 40:62–24. The fact that the enactment of *R. S.* 40:62–24 was deemed necessary is confirmation of our conclusion that the word "corporation" in *R. S.* 48:2–13, defining general jurisdiction, was not intended to embrace municipal corporations owning public utilities.

Glen Rock maintains, however, that in any event the Board was given power to regulate the rates charged by Ridgewood under the phrase "or other product" as contained in *R. S.* 40:62–24. It argues that water is one of the products contemplated by the statute. We cannot agree.

The principle of *ejusdem generis* affords some aid, even if in interpreting this section we consider it in isolation. The general reference to "other product" takes its meaning from the specific terms preceding it, "electricity, gas, steam." *Denbo v. Moorestown Twp.,* 23 *N. J.* 476 (1957); *Salomen v. Jersey City,* 12 *N. J.* 379 (1953); *Studerus Oil Co. v. Jersey City,* 128 *N. J. L.* 286 (*Sup. Ct.* 1942). Therefore, "other product" includes only those products which might be developed and supplied beyond the boundaries of the municipality for light, heat or power purposes. Potable water is not one of them.

But even more important is the meaning vouchsafed by the setting in which *R. S.* 40:62–24 is found. This statute does not stand by itself; it is the next to the last section in an article dealing exclusively with "Power, Heat and Light Plants." The preceding sections clearly establish the meaning intended for "other product."

*R. S.* 40:62–12 allows municipal acquisition of property for the manufacture, generation and transmission of "gas, electricity, steam, or other product * * * for supplying light, heat or power. * * *" *R. S.* 40:62–21 contains the same qualifying phrase, making it apparent from an examination of all of the sections of the article that the "other product" referred to means one, like gas, electricity or steam, which can be utilized to produce light, heat or power. See also *R. S.* 40:62–15 (no municipality shall acquire or construct any "light, heat or power plant" without the authorization of a majority of its legal voters).

The supplying of water is so important in its own right that presumably jurisdiction over it would have been given to the Board in specific terms, if at all, and not in an offhand manner by use of the general phrase "or other product." But there was no reason for the Legislature to deem that water was covered by "other product," for also as a part of the Home Rule Act it adopted a series of statutes which in a comprehensive fashion specifically regulate municipalities supplying water to persons beyond their boundaries. We note especially *R. S.* 40:62–77, 83, 84 and 85, to which further reference will be made below.

▮ Appellant next directs our attention to *R. S.* 40:62–49, particularly *subsection* (*f*), which provides generally that any municipality acquiring a water distribution system extending into a neighboring municipality "shall furnish and supply water to the adjoining municipality in which the connected distribution system is located and to any other municipality served from the same source or sources of supply when acquired, to the extent, for such length of time and under such terms and conditions as may be ordered by the board of public utility commissioners." Glen Rock argues that rate-making is comprehended in "terms and conditions" and that by this statute, if not before, the Board was granted power to control the rates charged by Ridgewood.

▮ There is no need, however, to attempt to divine the precise meaning of *R. S.* 40:62–49(*f*), since it is clearly inapplicable on the facts before us. This statute was enacted

in 1929, eight years after Ridgewood had purchased the Bergen Aqueduct Company and had begun to supply the residents of Glen Rock with water. Ordinarily, it is presumed that a statute operates prospectively and not retroactively unless the Legislature otherwise specifies. *Nichols v. Board of Education, Jersey City,* 9 *N. J.* 241 (1952); *Kopczynski v. County of Camden,* 2 *N. J.* 419 (1949). Here, this presumption is reinforced by the original wording of the enactment, italicized in the quotation below, which was omitted when the statute was revised. *L.* 1929, *c.* 222, *p.* 415, read:

"1. Any municipality *not owning and operating a waterworks system or plant* is hereby authorized to acquire by purchase, lease or condemnation, an existing waterworks system or plant. \* \* \*
2. The municipality acquiring said property as aforesaid, shall furnish and supply water to the adjoining municipality in which the connected distribution system is located and to any other municipality served from the same source or sources of supply when acquired, to the extent, for such length of time and under such terms and conditions as may be ordered by the Board of Public Utility Commissioners of this State \* \* \*."

Clearly, this statute was to affect only acquisitions made after its adoption and not those which preceded it. The fact that the language plainly importing a prospective application was dropped during revision does not reflect a change in the legislative intent. A revision is not construed to alter preexisting law unless there is a clear indication that the Legislature desired it to have such effect. *Kessler v. Zink,* 136 *N. J. L.* 479 (*E. & A.* 1948).

Finally, on the issue of statutory interpretation, an enactment passed in 1947 sustains the conclusion that none of the statutes previously discussed entrusted the Board with power to regulate the charges made to consumers by a municipally owned water utility. *N. J. S. A.* 40:62–85.1 provides:

"Whenever any city of the second class having a population of not less than one hundred twenty thousand inhabitants and solely owning or controlling water works or its own water supply, is supplying or shall supply water to the inhabitants of, or to other consumers of water within, any other municipality the rates now or

"to be charged therefor shall be subject to the jurisdiction, regulation and control of the Board of Public Utility Commissioners in the same manner and to the same extent as are the rates of public utilities and to that extent and for that purpose such supplying city shall be deemed to be a public utility."

As stated before, the Board's own interpretation of its powers and responsibilities, standing over a number of years, is extremely impelling in determining their scope. Its conclusions are even more impressive when they are, inferentially at least, concurred in by the Legislature. *Lane v. Holderman, supra; Harper v. N. J. Manufacturers Casualty Ins. Co.,* 1 *N. J.* 93 (1948).

If prior to 1947 the Board possessed general regulatory powers over rates charged for water by one municipality to the inhabitants of another, there was no need for the special enactment in 1947 specifically giving the Board jurisdiction limited to rates charged by a second-class city of not less than 120,000 inhabitants which supplies water to the residents of another municipality. Ridgewood, of course, is not such a second-class city.

Turning to the pragmatic aspects of a determination that the Board lacks jurisdiction, appellant argues that without state regulation it is defenseless against arbitrary and oppressive rate increases enforced by Ridgewood. Glen Rock urges it will suffer a severe detriment since its citizens have no political control over the governing body of Ridgewood.

In answer to this contention, it is sufficient to note that a system of controls independent of the Board of Public Utility Commissioners has been established by the Legislature. *R. S.* 40:62–83 provides that no contract for the sale of water to a person or corporation beyond the municipal boundaries shall extend for more than 25 years. The consent of the municipality in which the consumer resides must be obtained. *R. S.* 40:62–83 and 85. Before any contract can be made, it must be approved by the "state board or department having jurisdiction of such matters * * *." *R. S.* 40:62–84.

Most important for present purposes, however, is *R. S.* 40:62–85, which provides that where water is supplied to users in another municipality, the distributing municipality must furnish it "upon the same, or as favorable terms and conditions, as water shall be furnished to dwellers within such municipality * * *." Thus, there is a very effective deterrent against the Village of Ridgewood charging excessive rates to the inhabitants of Glen Rock. The people of Ridgewood would suffer equally. The self-interest of the voters of Ridgewood will protect the residents of Glen Rock.

At any rate, individual consumers can call upon the courts to review allegedly arbitrary rates by bringing an action in lieu of the former prerogative writ of *certiorari*. *P. J. Ritter Co. v. Bridgeton*, 135 *N. J. L.* 22 (*Sup. Ct.* 1946), affirmed *o. b.* 137 *N. J. L.* 279 (*E. & A.* 1948). This is now available as of right in the Superior Court. 1947 *Constitution, Art.* VI, *Sec.* V, *par.* 4. Since the Board of Public Utility Commissioners has no jurisdiction under the Public Utility Act, the courts are not precluded from exercising their traditional powers under the principle of *certiorari*.

Despite its lack of statutory jurisdiction, Glen Rock nevertheless suggests that the Board should be ordered to arbitrate the controversy with Ridgewood. This argument is predicated upon the terms of an ordinance under which the Glen Rock Water Works, Inc., was granted a franchise by the Borough of Glen Rock to lay conduits in its streets. Glen Rock Water Works was a predecessor to the Bergen Aqueduct Company, from which the Village of Ridgewood purchased its municipal water supply system.

Even if we assume that Ridgewood, as a successor once removed to the Glen Rock Water Works, is bound by the arbitral portion of the agreement between the Water Works and the Borough of Glen Rock, the Board cannot be compelled to act as arbitrator.

Jurisdiction may not be conferred by consent on an administrative body, 42 *Am. Jur., Public Administrative Law*, § 109, and the agreement to have the Board

act as arbitrator is merely an indirect means to this end. The duties of the Board are defined by statute and cannot be increased except by legislative command. We have no authority to add to the tasks of the Board. The question of whether a court could appoint a third party to act in the Board's stead does not confront us upon this appeal.

The decision of the Board of Public Utility Commissioners is affirmed.

FRANCIS, J. (dissenting). A private enterprise supplying water for general use to the inhabitants of a municipality by means of a system which it owns and controls is a public utility, *N. J. S. A.* 48:2–13, and the rates charged the consumers are subject to regulation by the Board of Public Utility Commissioners, *N. J. S. A.* 48:2–21. When a municipality acquires such a system and undertakes to provide water not only for its own citizens but also for the residents of independent neighboring communities, it steps beyond the exercise of purely governmental functions and engages in a private or proprietary activity. *Fay v. Trenton,* 126 *N. J. L.* 52 (*E. & A.* 1941). Power to do this exists only by legislative grant, *Mongiello v. Borough of Hightstown,* 17 *N. J.* 611, 615 (1955), and when such sanction is given, the municipality's assumption of the character of a private utility operator naturally imposes upon it the obligation to charge fair and reasonable rates for the service. .

In the *Mongiello* case, *supra,* this court accepted the prevailing view to be that:

"'[t]he distribution of water by a municipality to its inhabitants for domestic and commercial uses is a private or proprietary function' and * * * a municipally-owned water facility may for the most part be treated as a 'public utility established under legislative authority.'" (17 *N. J.* at *page* 616)

The village, the Board of Public Utility Commissioners, and the majority opinion recognize the jurisdiction of the Superior Court to review the reasonableness of water rates charged by a municipality by action in lieu of prerogative

writ. However, the policy of committing that task in the first instance to an expert administrative agency has marked the conduct of law-making bodies in New Jersey as well as in our sister states for many years. This practice has had almost universal approval as a wise one, and it seems to me that when a municipal government operates as a private water utility, any existing statutes which are claimed to confer authority on the Board to regulate its rates ought to be liberally construed. *Cf.* Annotation, 127 *A. L. R.* 94, 96 (1940). For example, in *Lamar v. Wiley,* 80 *Colo.* 18, 248 *P.* 1009, 1010 (1926), the Colorado Supreme Court said:

"When a municipality * * * in its operation of its own public utility * * * furnishes public service to its own citizens, and in connection therewith supplies its products to consumers outside of its own territorial boundaries, the function it thereby performs, whatever its nature may be, in supplying outside consumers with a public utility, is and should be attended with the same conditions, and be subject to the same control and supervision, that apply to a private public utility owner who furnishes like service."

And see, *Wheeling v. Benwood-McMechen Water Co.,* 115 *W. Va.* 353, 176 *S. E.* 234 (*Sup. Ct.* 1934); *Shirk v. Lancaster,* 313 *Pa.* 158, 169 *A.* 557, 90 *A. L. R.* 688 (*Sup. Ct.* 1933); *Star Investment Co. v. Denver, P. U. R.* 1920B 684 (1919) (Colo); *Public Service Commission v. Helena,* 52 *Mont.* 527, 159 *P.* 24 (*Sup. Ct.* 1916).

In 1921 Ridgewood purchased the water system of the Bergen Aqueduct Company, which at that time supplied the inhabitants of Ridgewood as well as those of the Boroughs of Glen Rock, Midland Park and a portion of Wyckoff. Since then it has continued to provide water for these users. A 1956 increase in rates produced the present complaint by the Borough of Glen Rock. As the majority opinion indicates, the Board dismissed the action for lack of jurisdiction.

When a municipality acquires a water works which is part of a system serving adjoining and other municipalities, *N. J. S. A.* 40:62–49(*f*) provides:

"The municipality acquiring property as provided in paragraph 'd' of this section shall furnish and supply water to the adjoining municipality in which the connected distribution system is located and to any other municipality served from the same source or sources of supply *when acquired*, to the extent, for such length of time and under *such terms and conditions* as may be ordered by the board of public utility commissioners." (Emphasis added.)

The purpose of this statute seems perfectly clear. It was designed to protect those persons who do not reside within the territorial limits of the purchasing municipality but who *had been receiving* their water from the source purchased. A mandate is imposed to continue their service "under such terms and conditions as may be ordered" by the Board. Manifestly, the prices to be paid for the water are within the connotation of "terms and conditions."

The opinion of the majority does not deny that the language of the quoted section of the statute supports the claim of jurisdiction in the Board. It avoids this conclusion by pointing out that subsection (f) came into being in 1929, *L*. 1929, *c*. 222, eight years after Ridgewood become owner of the facilities under discussion. The majority declares it to be inapplicable here for two reasons: first, because laws generally operate prospectively and not retrospectively, and second, because the first sentence of the 1929 act shows an intended prospective operation.

The first sentence said:

"Any municipality not owning and operating a water-works system or plant is hereby authorized to acquire by purchase, lease or condemnation, an existing water-works system or plant * * * for the public and private uses of such municipality."

When the statutes were revised in 1937, this sentence was excised by the Legislature. But my confreres say that such a change in the course of the revision cannot be considered indicative of an intent to alter the original forward thrust of the act. This may be accepted as generally true, since the *Revised Statutes* are to be construed as a continuation of prior laws in the absence of inconsistency. *N. J. S. A.* 1:1-4.

Oddly, the suggestion of prospective scope of the 1929 act is predicated upon a sentence which appears to authorize the acquisition of a water system caring for more than one municipality. Ridgewood became the owner of this type of system in 1921 and no contention is advanced that the purchase was *ultra vires*. Obviously, there is no sound reason why non-resident water customers of a municipal water works who became such by virtue of a pre-1929 acquisition should be treated any differently from or receive any less protection than those who assumed that status after 1929. So the revisers in preparing, and the Legislature in adopting, Article 8, entitled "Water Supply" (under the topic heading "Public utilities municipally owned") with its subtitle "By a single municipality," integrated *L.* 1929, *c.* 222, in its logical place in *R. S.* 40:62, namely, as subsection 49(*f*). The elimination of the first sentence of the 1929 act carried with it as an inevitable consequence the basis for the claim that the grant of jurisdiction to the Board related only to post-1929 acquisitions. Thus, under its present text the statute subjects a municipal water utility, *whenever acquired,* to the jurisdiction of the Board in the instances specifically covered, that is, when *at the time of purchase* it was functioning as the source of supply for other municipalities. That this broad sweep of the law is inconsistent with an intention to continue its application to post-1929 transactions alone does not seem open to question.

The argument has been advanced that if prior to 1947 the board had *"general regulatory powers over rates"* charged for water by one municipality to the inhabitants of another, there was no need for the special enactment in 1947 specifically giving the Board jurisdiction over rates fixed by a second class city of not less than 120,000 inhabitants which supplies water to the residents of another municipality. In this connection, it should be noted that no claim has been made that the Board has *general* regulatory power over all municipal water utilities by reason of *N. J. S. A.* 40:62–49(*f*). As has already been indicated, its jurisdiction

is limited thereunder to cases where *at the time of acquisition* other municipalities are being supplied by the purchased system. When this is realized, it becomes apparent that the 1947 act, *L.* 1947, *c. 295, N. J. S. A.* 40:62–85.1, lends support for the view projected in this dissent.

Prior to 1947, if the service of a municipally owned waterworks had always been confined to its own inhabitants, manifestly subsection 49 (*f*) would not bring the facilities within the regulatory power of the Board. Neighboring communities were not being supplied *at the time of acquisition.* Then, if at a later time it began to serve them or contemplated doing so, 49(*f*) still would not be pertinent and the users in the foreign municipality could not take advantage of the protection against excessive rates provided thereby. Accordingly, a persuasive inference arises that in 1947 this realization came to the Legislature and it was decided to extend the beneficial jurisdiction of the Board to include regulation of rates imposed upon non-local users by any second class city of the type described. The wisdom of confining the additional grant of authority to such second class cities (within constitutional limits) is not at issue in this proceeding.

Finally, the majority regards *N. J. S. A.* 40:62–85 as a most important consideration militating against the idea of legislative belief that regulatory power in this instance is in the Board. The cited statute prescribes that the proprietor municipality undertaking to furnish water to residents of another community must do so at the same or as favorable rates as those exacted from its own citizens. And the thought is expressed that such a stricture would act as "a very effective deterrent" against excessive rates because the self-interest of the voters of the owner municipality would protect the foreign consumers. But the self-interest may very well move in another direction. Suppose there are many more users in the foreign than in the local owner municipality. Under *N. J. S. A.* 40:62–57, whatever surplus water utility revenue exists after expenses are met goes into the municipal treasury. Such a profit, of course,

would be reflected in the tax rate. Local water users might well close their eyes to rates which, in the long run, would bring them a greater benefit in the form of tax reductions. In any event, such hopes and hypotheses are not particularly significant or decisive of the problem before us.

Study of the statutes discussed has led me to the conclusion that original jurisdiction over the reasonableness of the water rates charged by Ridgewood is in the Board of Public Utility Commissioners. Consequently I must vote to reverse the order of dismissal.

*For affirmance*—Chief Justice WEINTRAUB, and Justices OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—Justices HEHER and FRANCIS—2.