JENNIE MONGIELLO, PLAINTIFF-APPELLANT, v. BOROUGH
OF HIGHTSTOWN, DEFENDANT-RESPONDENT.

Argued February 7, 1955—Decided March 14, 1955.

612

*Mr. Robert E. Dietz* argued the cause for the appellant.

*Mr. James S. Turp* argued the cause for the respondent (*Messrs. Turp and Coates*, attorneys).

The opinion of the court was delivered by

JACOBS, J. In *Mongiello v. Borough of Hightstown*, 31 *N. J. Super.* 1 (1954), the Appellate Division held that the Borough of Hightstown was under no duty to supply water from its municipal water supply system to the plaintiff, a resident of the adjoining Township of East Windsor. We granted certification under *R. R.* 1:10–2. See 16 *N. J.* 221 (1954).

Hightstown, which is entirely surrounded by East Windsor, originally established its municipal water supply system in 1895 through the issuance of municipal bonds. The water is obtained from artesian wells within the borough, is pumped through a filtration plant into a standpipe, and then distributed. The borough's present facilities for supplying water are operating near their capacity and if the borough is called upon to supply any large number of additional users it will be required to enlarge its plant. The present water system is supported mostly by rentals and to some extent by general taxation, and the cost of any enlargement would presumably be raised through a bond issue to be paid by the borough's taxpayers. In 1952 the customers receiving water service from the borough totaled 1,052; of this number 58 were residents of East Windsor. These residents of East Windsor lived in areas abutting the borough, supplied their own facilities for conducting the water from the termini of the borough mains to their respective properties, and were charged at a rate in a specific percentage above the rate charged to residents of the borough.

One of the aforementioned areas in East Windsor extends along Monmouth Street from the borough line. In 1951 the New Jersey Turnpike installed a six-inch main in Monmouth Street for the purpose of delivering water to four properties near the Turnpike on which the wells had been destroyed by construction of the Turnpike. This main was connected with the borough's main and the owners of the four properties are being served by Hightstown's water system; they are included within the 58 residents of East Windsor hereinbefore mentioned. The service to these four properties is pursuant to a municipal resolution dated August 21, 1951 in which the borough authorized the execution of a contract with the Turnpike Authority under which the borough would supply water to them for 25 years; the resolution expressly provided that the borough's action was being taken in a spirit of cooperation with the Turnpike Authority and was not to be construed as indicating any borough policy "of extending water mains into the Township of East Windsor or of providing water to its inhabitants." The Turnpike Authority has transferred title to the six-inch main to the borough and that is the borough's only main in East Windsor.

On December 23, 1952 the plaintiff made application for permission to connect to the borough's system on Monmouth Street in East Windsor and to purchase water from the borough "to supply about 38 houses" which she proposed to erect in East Windsor. Apparently the plaintiff's plan was to connect to the six-inch main originally installed by the Turnpike Authority, and to purchase from the borough the water needs of a housing development which would start with 38 houses. Testifying on her behalf, her son stated that there was "more ground there to build more in case we decide and if we get the water we will probably build more than thirty-eight homes"; he testified further that although there was a well on his mother's property its use for the service of water to the prospective homes would entail compliance with governmental regulations and "be a big thing." The plaintiff's application was denied on the basis of a policy that the borough would not undertake to supply water to any new

customers who were non-residents. This policy was apparently first announced on February 5, 1952 when the borough, in denying an application by F. J. Hausser for water service to a certain tract in East Windsor, announced that the Borough Council "was of the opinion that no more water service should be furnished out of the Borough." Councilman Bentley, in charge of the Water Department, testified that the borough's policy is not "to extend water outside the Borough limits"; that its policy was adopted to protect the people of Hightstown in view of the fact that the borough's water system was "approaching its limit"; and that pursuant to the borough's policy he had consistently advised many residents of East Windsor, in response to their recent inquiries, that they would be unable to obtain water service from the borough.

The plaintiff contends that the borough's denial of her application was improper and that the Law and Appellate Divisions erred in sustaining it. In support of her position she urges (1) that the borough is a public utility in the operation of its water supply; (2) that it is under absolute obligation to serve all residents of East Windsor in the area involved; and (3) that if it is deemed to have discretionary authority to refuse service to such persons its denial constituted an abuse of discretion. She relies primarily on *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, 10 N. J. 229 (1952), where this court held that the township had improperly denied an application for extension of its water mains to provide water for the plaintiff's lands. Unlike the case before us, the plaintiff there was not a non-resident and the denial of its application was evidently grounded on its refusal to establish certain lot frontages sought by the Township. In his opinion Justice Heher concluded that "it was an abuse of discretion to use the grant as a means of coercing the landowner into acceptance of the minimum lot-size restriction upon his lands."

We are not here concerned with the responsibilities of private water companies to expand their facilities to meet the increasing needs of the communities being served by them.

*Cf. In re Tp. of Lakewood,* 29 *N. J. Super.* 422, 429 (*App. Div.* 1954); *Middlesex Water Co. v. Bd. of Pub. Utility Comm'rs,* 6 *N. J. Misc.* 51, 54 (*Sup. Ct.* 1928). We are concerned here only with the responsibilities of municipalities which have established municipal water systems for the benefit of their residents and have extended incidental service to small numbers of adjoining non-residents. *R. S.* 40:62–47 expressly authorizes every municipality "to provide water for the public and private uses of the municipality and its inhabitants." In *Town of Kearny v. City of Bayonne,* 90 *N. J. Eq.* 499, 503 (*Ch.* 1919), affirmed 92 *N. J. Eq.* 627 (*E. & A.* 1921), the court expressed the general rule to be that power in a municipality to furnish water to its own inhabitants must be rested on direct legislation and "that the grant of power generally to provide a water supply for the inhabitants of a municipality does not carry with it the right to furnish water to inhabitants of other territories." *Cf. Perth Amboy v. Barker,* 74 *N. J. L.* 127, 130 (*Sup. Ct.* 1906); *Valcour v. Village of Morrisville,* 104 *Vt.* 119, 158 *A.* 83 (1932). In *R. S.* 40:62–83 the Legislature authorized every municipality owning and controlling its own water supply to make contracts for the sale and supply of water "either within or without the territorial limits of the municipality" for periods not exceeding 25 years. It may be noted that this statute simply authorizes the execution of contracts specifically limited in time and the borough's contract with the Turnpike Authority was executed thereunder. In *R. S.* 40:62–85 the Legislature authorized any municipality owning or controlling waterworks to supply water to dwellers and consumers in other municipalities "through which its mains may pass with water"; it may well be that this statutory language had reference to situations in which the municipality's water supply originated outside its borders and passed through other municipalities to reach it. *Cf. Town of Kearny v. City of Bayonne, supra.* Where water is to be supplied to residents of another municipality it is essential under the terms of *R. S.* 40:62–83 and *R. S.* 40:62–85 that consent of that municipality be obtained; and nowhere in either *R. S.*

40:62–83 or *R. S.* 40:62–85 is there to be found any suggestion whatever of legislative purpose to compel a municipality to serve non-residents in the absence of its voluntary undertaking.

In *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, *supra*, the court expressed the prevailing view that "the distribution of water by a municipality to its inhabitants for domestic and commercial uses is a private or proprietary function" and that a municipally-owned water facility may for the most part be treated as a "public utility established under legislative authority." See *R. S.* 40:62–47 *et seq.*; *R. S.* 58:6–1; *Lehigh Valley R. R. Co. v. Jersey City*, 103 *N. J. L.* 574, 577 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 437 (*E. & A.* 1928); *Fay v. City of Trenton*, 126 *N. J. L.* 52, 54 (*E. & A.* 1941). *Cf. In re Passaic Consolidated Water Co.*, 8 *N. J. Misc.* 506, 510 (*Sup. Ct.* 1930). Within its territorial borders the municipality must ordinarily extend its water service to all of its inhabitants on like terms; there are, however, many decisions which recognize that even when dealing with its own inhabitants a municipality has discretionary authority to decline to extend its water mains or enlarge its water system where the cost to the community would be grossly disproportionate to the individual needs presented. See 12 *McQuillin, Municipal Corporations*, 638 (1950); *Rose v. Plymouth Town*, 110 *Utah* 358, 173 *P. 2d* 285 (1946); *Lawrence v. Richards*, 111 *Me.* 95, 88 *A.* 92, 47 *L. R. A., N. S.*, 654 (1913). *Cf. Town of Wickenburg v. Sabin*, 68 *Ariz.* 75, 200 *P. 2d* 342 (1948); 34 *Am. Jur.* 970 (1941); 45 *A. L. R.* 829 (1926). Neither in the *Reid* case nor in any of the other cited cases is there any suggestion that the public utility aspect of the municipal water system may be extended to compel service outside the municipal borders; and there are decisions indicating the contrary. See *Valcour v. Village of Morrisville, supra; Richards v. City of Portland*, 121 *Or.* 340, 255 *P.* 326 (1927); *Childs v. City of Columbia*, 87 *S. C.* 566, 70 *S. E.* 296, 34 *L. R. A., N. S.*, 542 (1911); *Collier v. City of Atlanta*, 178 *Ga.* 575, 173 *S. E.* 853 (1934); *Pond, Public Utilities*, 152 (1925).

In the *Valcour* case [104 *Vt.*, 158 *A.* 87] the Vermont Supreme Court recognized that under its law the Village of Morrisville had authority to dispose of its surplus electricity outside its territorial limits but pointed out that in such operations it "was not acting as a public utility" and that its relations with its non-resident consumers were "purely contractual." In the *Richards* case [121 *Or.* 340, 255 *P.* 329] a non-resident brought an action against the City of Portland to prevent its discontinuance of water service to him and other non-residents similarly situated. In denying the relief sought the Oregon Supreme Court, after quoting its pertinent legislation, said:

"The above sections of the statute authorize the city to sell water to people residing outside of its boundaries, to the end that the water system may be operated for the benefit and use of its inhabitants. It is not within the purview of the statute to confer authority upon a municipality to engage in a water business as a public utility beyond its boundaries. Such is a departure from the usual way in which a municipal government functions, and, where it is doubtful whether such power has been conferred, the doubt should be resolved against the grant. Considering in their entirety the charter and statutory provisions applicable to the operation by the city of its water system, we think it is thereby clearly intended that the inhabitants of the city should have superior rights as water consumers over the plaintiffs and others similarly situated.

The water system was established at the expense of the taxpayers of the city, and a holding that those who have not borne such burden shall have equal rights therein would not be based on sound equitable principles. . Authority is vested in the city to dispose of surplus water, but its officials must not barter away that which is in the nature of a public trust. *Pikes Peak Power Co. v. City of Colorado Springs*, [8 *Cir.*] 105 *F.* 1. The water system was constructed primarily to serve those who paid for it. When such projects are undertaken by a municipality, the capacity of the plant is generally in excess of its present use, and it is reasonble to assume that sale of surplus water was contemplated. In 19 *R. C. L.* 790, it is said:

'Nor can it (referring to municipality), without express statutory authority, supply water to premises located outside the corporate limits, and, when it is so authorized, its obligation is a matter of voluntary contract, and such authorization does not impose upon it the duties of a public service corporation in the territory which it undertakes to serve'—citing *Childs v. [City of] Columbia*, 87 *S. C.* 566, 70 *S. E.* 296, 34 *L. R. A.*, *N. S.*, 542, which supports the text."

The case before us does not strictly involve (as did the *Richards* case) any issue as to the borough's right to discontinue the service heretofore rendered to non-residents. Nor is any issue presented as to the borough's right to decline to serve additional non-residents without reasonable cause or basis. The record in the instant matter satisfies us that there was no personal or arbitrary discrimination and that the borough's present policy represents a sound and uniformly applied measure for the future protection of its own inhabitants; reason and the cited authorities leave little room for doubt that adoption of the policy was well within the borough's lawful powers. It must be borne in mind that the borough never undertook to serve East Windsor or its residents generally and never sought or acquired any monopoly there; it simply accommodated the occasional East Windsor home-owners who could conveniently connect with borough mains at its borders plus the four properties covered by the limited contract with the Turnpike Authority. This obviously represented no real threat to the municipal water system or the needs of the borough's inhabitants, present and prospective, such as that presented by the plaintiff's application. Indeed, if the plaintiff may compel the borough to serve her water needs, other East Windsor developers will be entitled to like service with consequential impairment of the borough's water services to its own inhabitants or the expenditure of substantial funds to be supplied by its taxpayers. This result would be grossly unjust to the borough's inhabitants and would defeat the very objective of the Legislature in authorizing municipal governing bodies to operate water systems for the benefit of their own communities. *R. S.* 40:62–47. A municipal water system should be so operated as to serve effectively the municipality and its residents; if non-residents can incidentally be served as an accommodation and without endangering the local service all well and good; but such incidental service to non-residents may not fairly be converted into an obligation to render additional non-resident service tending to jeopardize the service within the municipality. See *Richards v. City of*

*Portland, supra*; 3 *Dillon, Municipal Corporations*, 2127 (1911); 12 *McQuillin, supra*, at 667 *et seq. Cf. Nelson v. Wayne County*, 289 *Mich.* 284, 286 *N. W.* 617 (1939).

The plaintiff places reliance on *Reigle v. Smith*, 287 *Pa.* 30, 134 *A.* 380 (1926), where the Pennsylvania Supreme Court broadly stated that so long as a municipality serves some non-residents "it cannot discriminate as to others." As Judge Clapp noted in the Appellate Division (31 *N. J. Super.*, at 5) the Borough of Halifax had there purchased the plant of a private water company which had rendered general service to a neighboring community, thus presenting considerations not pertinent here. See 12 *McQuillin, supra*, at 682. In the later case of *City of Altoona v. Pennsylvania Public Utility Comm'n.*, 168 *Pa. Super.* 246, 77 *A. 2d* 740 (1951), the court recognized that even under Pennsylvania law the City of Altoona, which was also operating a municipal water system largely acquired from privately owned water companies, could not be required to serve non-residents without limit. In the course of his opinion Judge Hirt pointed out that almost the whole of the City of Altoona was surrounded by Logan Township and that:

"obviously, extensions from time to time of existing service to residents of the township cannot be ordered without limit. The burden on the city cannot be unreasonably increased to provide that service."

See *Nelson v. Wayne County, supra.*

■ We have concluded that the borough's denial of the plaintiff's application was proper and that the judgment of the Appellate Division sustaining it must be:

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.