775 A.2d 182 (2001)
BI-COUNTY DEVELOPMENT OF CLINTON, INC., Plaintiff-Respondent,
v.
BOROUGH OF HIGH BRIDGE, a municipal corporation of the State of New Jersey, Defendant-Appellant, and
Clinton Township Sewerage Authority, a New Jersey Utility and the State of New Jersey, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 2001.
Decided June 18, 2001.
*183 Valerie K. Bollheimer argued the cause for appellant (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Ms. Bollheimer, Bedminster, on the brief).
Robert M. Washburn argued the cause for respondent (Flaster/Greenberg, attorneys; Carl S. Bisgaier and Sharon A. Morgenroth, Cherry Hill, on the brief).
Before Judges SKILLMAN, WECKER and LESEMANN.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
The issue presented by this appeal is whether a developer that pays money into a municipality's affordable housing fund in lieu of constructing a percentage of housing units affordable to lower income households may compel an adjoining municipality to allow the developer to connect into its municipal sewer system. We conclude that such a developer does not have a right to connect into the sewer system of an adjoining municipality which has elected to reserve the use of its system for its own residents.
Plaintiff Bi-County Development of Clinton, Inc. (Bi-County) owns a 46.2 acre tract of land in Clinton Township (Clinton). In 1987, Bi-County brought a Mount Laurel[1] exclusionary zoning suit against Clinton, which was subsequently transferred to the Council on Affordable Housing (COAH). In 1990, Bi-County and Clinton entered into a settlement agreement under which Clinton agreed to rezone Bi-County's property to allow for construction of as many as 187 residential units and as much as 10,000 square feet of commercial and/or office space. The agreement gave Bi-County the option of either making 10% of the proposed residential units affordable to low and moderate income households or contributing $2,000 per unit to Clinton's affordable housing fund. In 1992, Bi-County and Clinton agreed that Bi-County would make the stipulated monetary payment *184 to the affordable housing fund rather than constructing lower income housing.
In 1994, Bi-County obtained preliminary subdivision approval from Clinton's Planning Board for a development containing 187 detached single family homes and a 10,000 square foot commercial building.[2] The resolution approving Bi-County's subdivision application provided that the development could not be constructed until public water and sewer service became available. The resolution further provided that Bi-County would obtain sewer treatment capacity from the Clinton Township Sewerage Authority (Sewerage Authority) and that Bi-County would extend a sewer line along Route 31 to provide sewer service to the proposed development.
In 1997, Bi-County obtained a partial summary judgment against the Sewerage Authority in other litigation under which Bi-County was allocated 56,100 gallons per day of sewer treatment capacity.
Subsequently, Bi-County devised a plan to avoid the cost of constructing a new sewer line along Route 31 by contracting with the Department of Environmental Protection (DEP) to tie into a State owned sewer line that extends from the Spruce Run Recreation Area to the Borough of High Bridge sewage conveyance system. The High Bridge system consists of municipal sewer lines and a pump station which pumps sewage to the Sewerage Authority treatment facility. In 1970, High Bridge entered into an agreement with the DEP, pursuant to which the DEP constructed a sewer line from Spruce Run that runs along Route 31 and connects into the High Bridge system. The DEP indicated its willingness to consider Bi-County's proposal for the Sewerage Authority to take over ownership and maintenance of the DEP sewer line and allow Bi-County's proposed development to connect into the line. The Sewerage Authority initially indicated that it was receptive to this proposal, but when High Bridge refused to permit Bi-County's sewage to flow through its lines, the Sewerage Authority declined to pursue the proposal further.
After High Bridge refused to consent to Bi-County's plan to utilize its municipal sewer system to convey sewage from Bi-County's proposed development to the treatment plant, Bi-County brought this action against High Bridge, the State, and the Sewerage Authority, for declaratory and injunctive relief establishing its right to tie into the DEP-High Bridge sewer conveyancing system. The legal theory of Bi-County's complaint was that, because it will be making a monetary contribution to Clinton's affordable housing fund in lieu of making 10% of the residential units in its development affordable to low and moderate income households, the development should be considered an "inclusionary" Mount Laurel development, and High Bridge has an obligation to eliminate any "undue cost generating practices." Bi-County further alleged that High Bridge's system had excess capacity that could accommodate the anticipated sewage flow from its proposed development, and consequently, High Bridge's refusal to allow Bi-County to utilize the system constituted a prohibited "undue cost generating practice."
The case was brought before the trial court by cross motions for summary judgment. Bi-County and High Bridge submitted expert reports in support of their motions. One of Bi-County's expert reports concluded that "adequate conveyanc[ing] *185 capacity [exists] in the High Bridge wastewater system to accept [Bi County's] development flows under all flow scenarios ... without making improvements to the existing facilities." However, High Bridge's expert concluded that High Bridge would need to construct costly improvements to its sewage conveyancing system to accommodate the anticipated flow from Bi-County's proposed development. The Sewerage Authority's expert report reached the same conclusion.
The trial court concluded that because Bi-County is contributing to Clinton's affordable housing fund in lieu of constructing housing that would be affordable to lower income families, "it qualifies as an inclusionary development" under the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329, and Mount Laurel doctrine. The court also concluded that the "[c]onstitutional obligation to enable the creation of a realistic housing opportunity requires public entities to eliminate unnecessarily burdensome and undue cost[ ]-generating policies and regulatory provisions, and to cooperate with the developer such as plaintiff to minimize development costs." In addition, the court found on the basis of the expert reports and other evidential materials submitted on the cross-motions that "there is ample conveyancing capacity in the State line and the High Bridge conveyancing system to handle the anticipated sewerage flow from [Bi-County's] property[,]" and that "there is a very substantial cost differential to [Bi-County] if it is required to construct a new line on [Route] 31 as opposed to being allowed to utilize the State line and the High Bridge conveyancing system." Consequently, the court concluded that High Bridge's refusal to allow Bi-County "to connect to the State line and the High Bridge conveyancing system would have an undue cost-generative impact on this inclusionary development." Accordingly, the court entered a summary judgment in favor of Bi-County directing that "[s]ubject to agreement between the State of New Jersey and [Sewerage Authority] regarding transfer of the State line, High Bridge shall permit sewage conveyancing capacity for the amended Bi-County Development (32,500 gpd) access through the High Bridge conveyancing system, which shall be subject to service and connection fees[.]" The court dismissed Bi-County's complaint against the State, but indicated that that dismissal did not "preclude the State from voluntarily negotiating with the [Sewerage Authority] regarding transfer of the State line." The court did not grant plaintiff any specific relief against the Sewerage Authority.
On appeal, High Bridge argues that a developer such as Bi County is not entitled to "Mount Laurel protection" simply because it makes a "monetary contribution in lieu of constructing affordable housing[,]" and therefore, the trial court had no authority to direct High Bridge to grant Bi-County access to its sewage conveyancing system. In the alternative, High Bridge argues that the court erred in granting summary judgment because there are contested issues of fact as to whether the High Bridge system has excess conveyancing capacity and whether High Bridge's refusal to grant Bi-County access to that system is an "undue cost generating" practice. Bi-County has not cross appealed from the summary judgment in favor of the State.
We conclude that the trial court had no authority to compel High Bridge to grant Bi-County access to its municipal sewer. This conclusion makes it unnecessary to decide whether High Bridge presented contested factual issues concerning the existence of excess capacity in the system or whether the denial of access to *186 the system would impose undue costs upon Bi-County. Accordingly, we reverse the summary judgment in favor of Bi-County and remand for the entry of judgment in favor of High Bridge.
Initially, we note that Bi-County does not argue that a municipality which operates a sewer system has a statutory or common law duty to allow a property owner in another municipality to connect into that system. When a municipality constructs a public improvement, such as sewer lines, it ordinarily has no obligation to afford residents of another municipality access to that service. See Mongiello v. Borough of Hightstown, 17 N.J. 611, 614-19, 112 A.2d 241 (1955). The only exception to this rule is where a municipality enters into an agreement with another municipality to provide services to residents of that municipality. See ibid. Bi-County does not claim that High Bridge and Clinton have any agreement under which property owners in Clinton are entitled to connect into the High Bridge sewer system or that, apart from the Mount Laurel doctrine, there is any other basis upon which it could compel High Bridge to grant access to its sewer system.
Bi-County's argument is that, even though a developer ordinarily could not compel an adjoining municipality to allow access to its sewer system, it proposes to construct an "inclusionary" Mount Laurel development, and therefore, High Bridge has an obligation to eliminate any "undue cost generating practices" that may prevent that development from being constructed. In support of this argument, Bi-County relies upon Dynasty Bldg. Corp. v. Borough of Upper Saddle River, 267 N.J.Super. 611, 632 A.2d 544 (App.Div.1993), certif. denied, 135 N.J. 467, 640 A.2d 849 (1994), which held that the Borough of Ramsey could be compelled to revise a preexisting intermunicipal agreement to provide sewer service to part of the Borough of Upper Saddle River in order to extend sewer service to a proposed development for lower income housing in Upper Saddle River. We concluded that an order requiring Ramsey to make "existing sewer capacity available to Mount Laurel inclusionary development sites [in Upper Saddle River] comports with the concept that municipal obligations to provide for low and moderate housing are established on the basis of regional responsibility." Id. at 616, 632 A.2d 544.
However, Dynasty does not control this case because High Bridge does not have an intermunicipal agreement with Clinton under which High Bridge is obligated to provide sewer service to properties located in Clinton. Instead, High Bridge and Clinton each operate their own independent sewer systems, and residents of the respective municipalities have no right to compel the other municipality to allow a connection into its system. See Mongiello, supra, 17 N.J. at 614-19, 112 A.2d 241.
Bi-County also relies upon Samaritan Center, Inc. v. Borough of Englishtown, 294 N.J.Super. 437, 683 A.2d 611 (Law Div.1996), in which a trial court held that a municipality that adjoined the site of a proposed development for lower income housing in another municipality had an obligation to allow the developer access to its water and sewer lines:
The time has come to recognize ... that even in the absence of a pre-existing co-operation or inter-municipal agreement, each municipality, whether developing or developed, has an obligation to facilitate, if not assist, the regional goal of providing realistic housing opportunities for low and moderate income people in a cost effective manner. Everyone is a part of the region's housing solution for its most needy. That is clear in the history of the earlier cited *187 legislative enactments, culminating in the [Municipal Land Use Law], as confirmed by the Supreme Court in Mount Laurel II. That regional obligation is apparent, even if the municipality does not formally adopt zoning policies to impede such housing development in the neighboring municipality.
Englishtown has shown no credible reason for outright denying plaintiffs access to water and sewer service by connection to proximate and cost effective Englishtown lines in order to practically enhance a most important public policy concern.
[Id. at 455, 683 A.2d 611.]
We assume, without deciding, that in an appropriate case, this court would endorse the reasoning of Samaritan Center and hold that a municipality may be compelled to allow a developer of lower income housing in a neighboring municipality to connect into its sewer lines in furtherance of the regional obligation to provide affordable housing. However, Bi-County would not be entitled to this relief under Samaritan Center because it does not plan to construct lower income housing. Although Bi-County entered into a settlement agreement with Clinton under which it had the option of constructing lower income housing on its property, it elected instead to construct solely single family homes as well as a 10,000 square foot commercial building. Under Bi-County's revised development plan, it would construct 105 detached single family homes and a commercial building in exchange for the payment of $210,000 to the municipality's affordable housing fund. Thus, an order compelling High Bridge to allow Bi-County to connect into High Bridge's sewer system would not facilitate the construction of lower income housing. It would only lower the costs and thereby increase the potential profits from a development of single family homes and a commercial building. Therefore, even though Bi-County's payment of a development fee to Clinton presumably will assist in the construction of lower income housing somewhere,[3] this does not mean that Bi-County's development should be considered a residential development for lower income households which may demand that a municipal government minimize its development fees and costs.
Under COAH's development fee regulations, N.J.A.C. 5:93-8.1 to 8.21, a municipality that has received or petitioned for substantive certification may adopt an ordinance under which developers are required to pay a development fee, which for a residential development is equal to a maximum of one-half of one percent of the equalized assessed value, the appraised value utilized for construction financing or the coverage amount of the Home Owner Warranty document, N.J.A.C. 5:93-8.10(a), and which for commercial development is one percent of the equalized assessed value or the appraised value utilized for construction financing, N.J.A.C. 5:93-8.11(a). In addition, if property is rezoned for increased residential development, the ordinance may impose a development fee of up to six percent of the value of the additional authorized units. N.J.A.C. 5:93-8.10(b). If a municipality allows a developer of a site zoned for lower income housing to pay a development fee in lieu of constructing units affordable to lower income households, "[t]he fee may equal the cost of subsidizing the low and moderate income *188 units that are replaced by the development fee." N.J.A.C. 5:93-8.10(c).
We do not perceive any significant difference between Bi-County's election to pay $210,000 to Clinton's affordable housing fund pursuant to the terms of its settlement agreement with Clinton and any other developer making a payment to a municipality's affordable housing fund pursuant to a development fee ordinance adopted under COAH regulations. The record does not indicate whether Clinton has adopted a development fee ordinance, nor does it contain all the financial data that would be required to calculate a development fee if Clinton had such an ordinance. However, a municipality that had adopted a development fee ordinance establishing the maximum fees authorized by COAH probably could impose development fees upon a developer such as Bi-County that would equal or exceed the payment that Bi-County will make to Clinton's affordable housing fund.[4] Consequently, if we were to hold that this payment entitles Bi-County to connect its proposed sewer system into High Bridge's sewer system, any other developer who pays a development fee to a municipal affordable housing fund pursuant to a development fee ordinance could claim a similar entitlement.
To support the thesis that it has the same right to connect into an adjoining municipality's sewer system as a builder of lower income housing, Bi-County seizes upon the Supreme Court's statement in Holmdel Builders Ass'n v. Township of Holmdel, 121 N.J. 550, 576, 583 A.2d 277 (1990), that "[d]evelopment fees are the functional equivalent of mandatory set-aside schemes authorized by Mount Laurel II and the FHA." This statement was made in the course of the Court's explanation of its conclusion that the FHA impliedly authorizes the adoption of a development fee ordinance as part of a municipal Mount Laurel compliance plan. Id. at 566-580, 583 A.2d 277. However, the Court did not say that any developer which pays a development fee pursuant to such an ordinance has the same right to insist upon the elimination of any "undue cost generating" expenses as an actual developer of lower income housing. In fact, the Court distinguished between a developer that actually proposes to construct lower income housing and a residential developer that pays a development fee to an affordable housing fund, by characterizing *189 the latter form of development as a "non-inclusionary residential property." Id. at 585-86, 583 A.2d 277. Furthermore, in upholding the imposition of development fees upon commercial developers, the Court relied on the fact that such developers compete with developers of lower income housing for developable land and scarce resources, such as sewer capacity, and also increase the need for lower income housing. See id. at 571-73, 583 A.2d 277. Therefore, Bi-County's argument that any developer which makes a momentary contribution to a municipality's affordable housing fund may assert the same priority claim as a developer of lower income housing to unused sewer capacity in that municipality or, as in this case, an adjoining municipality, distorts the Supreme Court's rationale for upholding the validity of development fees and the Mount Laurel doctrine.
Moreover, although Bi-County repeatedly refers to its development plan for single family housing and a commercial building as an "inclusionary development," the FHA and COAH regulations indicate that this designation is reserved for developments that actually include housing affordable to lower income households. The FHA defines "[i]nclusionary development" to mean "a residential housing development in which a substantial percentage of the housing units are provided for a reasonable income range of low and moderate income households." N.J.S.A. 52:27D-304(f) (emphasis added). The COAH regulations define "[i]nclusionary development" to mean "a development containing low and moderate income units." N.J.A.C. 5:93-1.3 (emphasis added). Clearly, a development of single family houses sold at market rates is not a development "in which a substantial percentage of the housing units are provided for" or "contain[ ]" low and moderate income units. See also Holmdel Builders Ass'n, supra, 121 N.J. at 585-86, 583 A.2d 277 (referring to a residential development that does not contain lower income housing as a "noninclusionary residential property.") Therefore, Bi-County's obligation to pay $210,000 to Clinton's affordable housing fund does not transform its proposed development into an "inclusionary development" that can assert a right to compel an adjoining municipality to allow the developer to connect into its municipal sewer system.
Accordingly, the summary judgment in favor of Bi-County is reversed and the case is remanded to the trial court for entry of judgment in favor of High Bridge.
NOTES
[1] See Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983).
[2] Bi-County subsequently revised its plan and now proposes to construct 105 detached, single family homes and a 10,000 square foot commercial building. A new subdivision application seeking approval of this plan is currently pending before the Planning Board.
[3] The record does not indicate whether Clinton plans to use the development fee received from Bi-County to construct or rehabilitate lower income housing in Clinton or to fund lower income housing in another municipality pursuant to a regional contribution agreement. See N.J.S.A. 52:27D-312(a).
[4] As a developer of a site zoned for lower income housing that has elected to pay a development fee in lieu of constructing units affordable to lower income households, Bi County presumably would be subject to the section of a development fee ordinance adopted pursuant to N.J.A.C. 5:93-8.10(c), which provides that "[t]he fee may equal the cost of subsidizing the low and moderate income units ... replaced by the development fee." COAH has determined that as of January 2, 2001, a municipality that relies upon a regional contribution agreement (RCA) as part of its Mount Laurel compliance plan must "transfer at least $25,000 to a receiving municipality for each RCA unit." N.J.A.C. 5:93-6.5(c). If this $25,000 figure is viewed as "the cost of subsidizing the low and moderate income units . . . replaced by the development fee" within the intent of N.J.A.C. 5:93-10(c), Bi-County would be required under such an ordinance to pay $275,000 for the eleven units of lower income housing it will avoid constructing by its election to pay money to Clinton's affordable housing fund. We also note that even though the Supreme Court has indicated that "20 percent" is "a reasonable minimum" percentage of units to be devoted to lower income housing in a Mount Laurel development project, Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, supra, 92 N.J. at 279 n. 37, 456 A.2d 390, Bi-County is only obligated under its settlement agreement with Clinton to make ten percent of the residential units in its development affordable to lower income households, or to make what was deemed to be an equivalent monetary contribution to the affordable housing fund.