805 A.2d 433

BI–COUNTY DEVELOPMENT OF CLINTON, INC., A NEW JERSEY CORPORATION, PLAINTIFF–APPELLANT, v. BOROUGH OF HIGH BRIDGE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS, AND CLINTON TOWNSHIP SEWERAGE AUTHORITY, A NEW JERSEY PUBLIC UTILITY, DEFENDANTS.

Argued February 11, 2002—Decided August 5, 2002.

---

*Carl S. Bisgaier* argued the cause for appellant (*Flaster/Greenberg,* attorneys; *Mr. Bisgaier* and *Sharon A. Morgenroth,* on the briefs).

*Valerie K. Bollheimer* argued the cause for respondent (*Purcell, Ries, Shannon, Mulcahy & O'Neill,* attorneys).

*Daren R. Eppley,* Deputy Attorney General, submitted a letter in lieu of brief on behalf of respondent State of New Jersey, Department of Environmental Protection (*David N. Samson,* Attorney General of New Jersey, attorney).

*William P. Malloy,* Deputy Attorney General, submitted a brief on behalf of *amicus curiae,* Council on Affordable Housing (*David N. Samson,* Attorney General of New Jersey, attorney; *Douglas K. Wolfson,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

STEIN, J.

The issue before the Court is whether a developer that pays money into a municipality's affordable housing fund instead of constructing housing units affordable to lower income households may compel an adjoining municipality to allow it to connect into its municipal sewer system.

The Law Division granted summary judgment in favor of plaintiff, Bi–County Development of Clinton, Inc. (Bi–County), holding that Bi–County's proposed development qualified as an inclusionary development and that the refusal of defendant, Borough of High Bridge (High Bridge), to permit access to its sewer system had a cost generating impact on the development. Therefore, it determined that High Bridge was obligated to permit Bi–County access to its sewer system. The Appellate Division reversed the judgment of the trial court and held that payment of a development fee in lieu of constructing low and moderate income housing does not entitle Bi–County to connect into a neighboring municipality's sewer system.

We affirm the judgment of the Appellate Division. We hold that payment of a development fee in lieu of constructing affordable housing does not justify disturbing the general rule that a municipality is not obligated to provide access to its sewer system to residents of a neighboring municipality.

## I

### A

Bi–County is the owner and developer of a 46.2 acre parcel of land located near the intersection of State Highway No. 31 (Route 31) and County Road No. 513 (Route 513) in Clinton Township, New Jersey. There is direct access to Route 31 along the easterly side of the property. On the north, west and south sides of the property is the Spruce Run Reservoir Recreation Area, owned and operated by the State of New Jersey (State).

Bi–County's parcel is identified as Block 68, Lot 9, on the tax map of Clinton Township. At the time Bi–County acquired the property it was zoned to permit residential development of eight units per acre. Following a builders remedy lawsuit initiated by Bi–County, the property since has been zoned by the Township for an "inclusionary development" pursuant to the Township's certified Housing Element and Fair Share Plan (HE/FSP). Bi–County has received preliminary subdivision approval from the Planning Board of Clinton Township (Planning Board) permitting the development of 187 single family residential units. Subsequently, Bi–County has proposed construction of only 105 single family units with 10,000 square feet of land reserved for a commercial component of the development.

Defendant High Bridge, Clinton Township, and the Town of Clinton are neighboring municipalities. High Bridge, through its Department of Public Works, owns and operates a sewage conveyancing system that includes a sewage pumping station located on Route 513. Sewage is pumped through a force main that transmits effluent from High Bridge to the Town of Clinton Collection System where it flows to the Town of Clinton Sewage Treatment Plant (STP). In 1968, High Bridge contracted with the Town of Clinton to allow it to send its sewage to the Town of Clinton STP.

The State owns and operates a sewage transmission line, including a pumping station, that conveys sewage from the Spruce Run Reservoir Recreation Area to the High Bridge sewer system.

That transmission line runs directly along the frontage of Bi–County's property proceeding in a southerly direction along Route 31 to the intersection of Route 513. The sewer line then proceeds in an easterly direction along Route 513 to a connection point with the High Bridge system. In 1970, the State and High Bridge entered into an agreement whereby the State was permitted to connect its Spruce Run sewer line into High Bridge's line that eventually empties into the Town of Clinton STP.

In order for Bi–County's proposed development to be constructed, Bi–County must obtain sufficient sewage treatment capacity as well as a connection to a sewage treatment facility. As a result of prior litigation, the Town of Clinton STP will provide 56,100 gallons per day (gpd) of sewage treatment capacity for the Bi–County development. Although originally planning to construct its own sewer line to connect to the Town of Clinton STP, which may have required constructing a new pumping station as well, Bi–County now proposes as an alternative that it use available sewer capacity in the State owned sewer line and the High Bridge system.

B

In October of 1985, pursuant to the Fair Housing Act, *N.J.S.A.* 52:27D–309(a), Clinton Township (Clinton) timely filed a Resolution of Participation with the Council on Affordable Housing (COAH) and, on December 31, 1986, filed its first Housing Element and Fair Share Plan. Clinton included Bi–County's property in its HE/FSP as a site for inclusionary development. However, Clinton did not petition for substantive certification at that time.

In July of 1987, Bi–County initiated an exclusionary zoning builder's-remedy lawsuit, challenging Clinton's compliance with its Mount Laurel obligation and alleging that Clinton had 1) failed to act on Bi–County's preliminary site plan application that included an affordable housing set aside; 2) failed to adopt the necessary ordinances consistent with its HE/FSP; and 3) failed to seek COAH review for substantive certification. In November 1987,

Bi–County's motion to transfer the case to COAH's jurisdiction in order to exhaust the mediation and review process pursuant to *N.J.S.A.* 52:27D–316(b) was granted and the matter was transferred to COAH by court order.

In early 1987, Clinton apparently became aware of potential problems with the construction of a large development on the Bi–County site. A committee was formed to investigate the issue and to amend the HE/FSP accordingly. On December 1, 1987, the Planning Board approved a resolution amending its Master Plan and recommending amendments to the Municipal Zoning Ordinance. On December 3, 1987, Clinton filed an amended HE/FSP deleting the Bi–County site as a component of its affordable housing plan. With regard to the ongoing builder's remedy suit, a dispute arose about which of the two filed plans should be subject to the mediation before COAH. However, in March 1988, COAH issued an *Order* and decided that the plan on file when Bi–County's case was transferred from the courts, the initial HE/FSP, was subject to the mediation.

COAH ultimately transferred the case to the Office of Administrative Law (OAL) for review. The matter was eventually resolved when both parties executed a comprehensive thirty-two page Settlement Agreement (Agreement) in September 1990. The Agreement provided that Bi–County could develop its parcel with "up to one hundred eighty-seven (187) residential units and up to ten thousand (10,000) square feet of commercial and/or office space." The Agreement further provided Bi–County the option either to seek approval for "an on-site set aside for affordable housing of ten percent (10%) of the total units (evenly distributed between low and moderate units)" or,

[a]lternatively, at Bi–County's sole discretion, [it could make a] Contribution to the Township of Two Thousand Dollars ($2,000) for each of the up to 187 market rate units to be approved by the Planning Board pursuant to this Agreement, to be used by the Township for the satisfaction of its *Mt. Laurel* obligation to provide low and moderate income housing off-site by means of such COAH approved mechanisms as rehabilitation of existing units or Regional Contribution Agreements pursuant to *N.J.S.A.* 52:27D–312.

That contribution, if Bi–County elected the contribution plan, would be its sole responsibility concerning Clinton's *Mount Laurel* obligation. Furthermore, the agreement provided that "the Contribution in lieu of an on-site set aside, . . . shall be used by the Township solely for the creation of a realistic housing opportunity for low and moderate income households consistent with COAH regulations and subject to COAH approval."

Also included in the Agreement was the parties' recognition of COAH's Scarce Resource Order, entered in January 1988, when COAH determined that sewer capacity in the Township of Clinton was "of limited supply and a durational adjustment might be required as a result of inadequate sewer capacity." (A durational adjustment is a deferral of a "municipality's fair share obligation due to the lack of adequate public facilities and infrastructure capacity." *N.J.A.C.* 5:92–8.5(a).) The parties further noted that "COAH's durational adjustment regulations require municipal cooperation in obtaining adequate sewer capacity." See *N.J.A.C.* 5:92–8.5(c–f) and 5:92–8.6(c). Therefore, Clinton agreed "to take such action as is reasonable, appropriate and necessary to assist Bi–County in obtaining such access and treatment capacity and otherwise diligently support and cooperate with Bi–County in its efforts to achieve sewer treatment and capacity." The Township also agreed to assign all its rights under a contract with the Town of Clinton regarding sewer capacity to Bi–County. Moreover, if Bi–County was unable to reach agreements with private parties, the Township also agreed to "use its power of eminent domain to procure necessary water and/or sewer easements to reduce reasonably the cost of providing the necessary infrastructure to the Bi–County Tract and the development contemplated by this Agreement." The Township further agreed to expedite applications for site plan approval relevant to the Bi–County property and to cooperate with Bi–County to facilitate the construction of the development.

In October 1990, the terms of the Agreement were incorporated into Clinton Ordinance No. 436–90, including the limitation of the

development of the tract not to exceed 187 units, and the requirement of a ten percent set aside or a "cash contribution in the amount of $2,000 per approved dwelling unit, to be used for the development, redevelopment or rehabilitation of low and moderate income housing within Clinton Township, or through a Regional Contribution Agreement approved by the Council on Affordable Housing." In addition, Bi–County's property was located in the newly designated AH–3 (Affordable Housing District) zone, permitting single family residences on 5,000 square foot lots with public water and public sewer.

In April 1991, Clinton adopted a new HE/FSP and in August 1991 submitted it to COAH for review and substantive certification. The plan included the designation of the Bi–County tract as a potential affordable housing site along with two other sites designated AH–1 and AH–2. It also recognized the Agreement terms by which Bi–County was entitled to build up to 187 residential units and had the option either to construct affordable units equal to ten percent of the total number of units constructed or, in lieu of construction, to contribute $2,000 for each market rate unit to be used by the Township to satisfy its fair share housing obligation.

In February 1993, COAH granted Clinton substantive certification. In its report, COAH recognized the Bi–County tract as an inclusionary site along with two other sites, AH–1 and AH–2. However, it also noted Bi–County's option to build nineteen low and moderate income units (ten percent of 187) or provide a development fee in lieu of constructing those units. Reporting that Clinton's low and moderate income housing need was for 233 units, 58 to be rehabilitated and 175 units to be newly constructed, COAH contemplated that those units would be constructed only on the AH–1 and AH–2 sites in assessing Clinton's plan for complying with its *Mount Laurel* obligation.

COAH also recognized Clinton's problem regarding sewage treatment facilities, namely, that Clinton Township did not have a treatment plant, noting that the AH–2 and Bi–County sites even-

tually were to be "sewered and served by the [Town of] Clinton treatment plant." COAH also noted that the Town of Clinton STP was completing design plans to remedy deficiencies related to water quality standards.

As noted, in order to preserve treatment capacity for future affordable housing needs COAH had issued a Scarce Resource Order that was still in effect at the time of the substantive certification of Clinton's HE/FSP. In granting substantive certification, COAH included a durational adjustment "which will remain in effect until adequate wastewater treatment capacity becomes available to serve the AH–2 and AH–3 inclusionary sites." COAH also recognized Clinton's commitment pursuant to the Agreement reasonably to assist Bi–County in resolving the treatment capacity problem.

In April 1994, the Planning Board granted preliminary major subdivision approval for the Bi–County development project. In its approval, the Planning Board noted that pursuant to the Agreement Bi–County chose to contribute the sum of $2,000 for each market rate unit it constructed in lieu of actual construction of low and moderate income housing units. Although that decision was solely within Bi–County's discretion, Clinton apparently had requested Bi–County to make that payment rather than construct low income housing. The Planning Board also noted that if Bi–County constructed 187 market rate units as indicated in its current plan, then Bi–County's total monetary contribution would be $374,000.

Listed as one of the unresolved issues before final approval would be granted was public water and sewer capacity for the Bi–County development. Bi–County had reported that it would obtain public water from the Town of Clinton and sewer capacity from the Clinton Township Sewerage Authority (CTSA). Significantly, the Planning Board noted that Bi–County would have to "bring sewer and water lines down Route 31 to Halstead Street in order to service the project." The Planning Board also stated that "[a]ny approval granted by this Board will be contingent upon

the applicant [Bi–County] obtaining unconditional approval from the Clinton Township Sewerage Authority and Town of Clinton Public Works" to gain access to their public water and sewer capacities.

Although Bi–County clearly contemplated constructing sewer lines along Route 31 to connect with the Clinton system, Bi–County was unable amicably to obtain sewerage treatment capacity for the proposed development. Therefore, in October 1994, Bi–County instituted litigation against the Town of Clinton to obtain the necessary reservation of sewer treatment capacity. The outcome of that litigation was a court order entered January 31, 1997, requiring the Town of Clinton to reserve for the benefit of the Bi–County development 56,100 gallons per day of sewage treatment capacity at the Clinton STP.

Although that litigation apparently resolved the issue of transmitting sewage from the proposed Bi–County development to the Clinton STP, Bi–County subsequently developed an alternative plan in order to avoid construction of a new sewer line along Route 31 as it had originally planned. Bi–County sought instead to gain access to the State sewer conveyancing system that runs south on Route 31 and west on Route 513 to the High Bridge sewage conveyancing system that eventually empties into the Clinton STP.

The State at first was reluctant to cooperate, but eventually indicated that it would be willing to permit Bi–County to gain access to its line pursuant to an agreement whereby CTSA would take over the line's ownership and maintenance. The CTSA tentatively agreed to take over the line subject to its own conditions. However, Bi–County was unsuccessful in its efforts to obtain access to the High Bridge sewer system. In 1998, Bi–County filed the present action seeking declaratory and injunctive relief against High Bridge, the CTSA, and the State.

Bi–County seeks access to the High Bridge sewer system to convey sewage from the proposed development on its property through the State line to and through the High Bridge sewer

system to the Clinton STP for treatment. Bi–County asserts that the only alternative to achieve public water and sewage capacity for its proposed development would be to use the access it obtained through litigation to the Clinton STP by constructing an entirely new pumping station on its property and a new force main line that would run one mile in length parallel to the State line along Route 31 and continue parallel to the High Bridge line to a connection point in the Town of Clinton on Halstead Street. Bi–County claims that that alternative would be expensive, time consuming, unnecessarily duplicative of the High Bridge connection and unduly cost-generative. Plaintiff's experts estimate that it would cost Bi–County $676,830 to build the new line and pumping station. In comparison, the cost to connect to the High Bridge system would be only $13,750. Bi–County further asserts that High Bridge's system has excess capacity that could accommodate anticipated sewage flow from the proposed Bi–County development, and submitted an expert report to that effect. However, High Bridge submitted its own expert report concluding that costly improvements to the High Bridge system were necessary to accommodate the anticipated flow from the Bi–County development. Another expert report submitted by the CTSA reached a similar conclusion.[1]

Bi–County's legal argument is that it is an "inclusionary" development and that, as such, High Bridge has an obligation to eliminate any "undue cost generating practices" pursuant to the Fair Housing Act and COAH regulations. High Bridge argues that the Bi–County development is not entitled to any such preferential treatment. It asserts that because Bi–County is building in Clinton, High Bridge has no obligation to minimize its costs, and also notes that Bi–County does not intend to construct

---

[1] Bi–County has since submitted an amended subdivision application reducing the number of residential units it intends to construct to 105. Under that plan, Bi–County is required to build eleven affordable units or make a payment in lieu of $210,000, and the amount of expected sewage flow from the revised development plan is 32,500 gpd.

any low or moderate income housing, but merely contemplates a monetary contribution.

In September 1999, the trial court granted Bi–County's motion for summary judgment and ordered High Bridge to permit Bi–County access to its sewage conveyancing system, provided that an agreement is reached between the State and the CTSA regarding transfer of the State's sewer line. The trial court, relying on *Holmdel Builders Association v. Township of Holmdel*, 121 *N.J.* 550, 572–76, 583 *A.2d* 277 (1990), held that Bi–County's development "qualifies as an inclusionary development," stating:

> [I]t should be noted that [Bi–County's] development is part of a Mount Laurel settlement, a COAH-approved compliance plan, and it generates funds for affordable housing purposes. It was in response to the request by Clinton Township that plaintiff agree[d] not to construct affordable units on tract, and in lieu thereof to provide a financial contribution.

The court found that there was a very substantial cost differential to Bi–County if it were required to construct a new line as opposed to using the State line and the High Bridge system. The court also found that the significant costs of constructing a new line were "undue expenses because they are unnecessary. Health and safety issues are not implicated."

Finally, the court concluded:

> The record demonstrates that the refusal of the defendants to cooperate with plaintiff to enable the Bi–County property to connect to the State line and the High Bridge conveyancing system would have an undue cost-generative impact on this inclusionary development.

Because the court found that the High Bridge system had the capacity to accommodate the anticipated sewerage flow from the Bi–County development, the court concluded that there was no reason for High Bridge not to cooperate with Bi–County.

On appeal, High Bridge argued that (1) Bi–County was not an inclusionary developer entitled to preferential treatment simply because it made a monetary contribution in lieu of actually constructing affordable housing; and (2) that the trial court erred in determining that there were no contested facts concerning the capacity of the High Bridge system to accommodate increased flow from the Bi–County development.

The Appellate Division reversed the trial court's summary judgment in favor of Bi–County, concluding that a developer that pays money into a municipality's affordable housing fund in lieu of constructing units affordable to low and moderate income households does not have a right to connect into the sewer system of an adjoining municipality that has "elected to reserve the use of its system for its own residents." *Bi–County v. Borough of High Bridge*, 341 *N.J.Super.* 229, 231, 775 *A.*2d 182 (2001). That determination made it unnecessary for the court to decide whether there was a genuine issue of material fact concerning the capacity of the High Bridge system to accommodate the flow from the Bi–County development or whether the denial of access to the system imposed undue costs upon Bi–County. *Id.* at 235, 775 *A.*2d 182.

The court observed that to compel High Bridge to provide access to its system to Bi–County would not "facilitate the construction of lower income housing." *Id.* at 237, 775 *A.*2d 182. Rather, it would "only lower the costs and thereby increase the potential profits from a development of single family homes and a commercial building." *Ibid.* The court noted that although "Bi–County's payment of a development fee to Clinton presumably will assist in the construction of lower income housing somewhere, this does not mean that Bi–County's development should be considered a residential development for lower income households [that] may demand that a municipal government minimize its development fee and costs." *Id.* at 237–38, 775 *A.*2d 182. The court reasoned that "if we were to hold that this payment entitles Bi–County to connect its proposed sewer system into High Bridge's sewer system, any other developer who pays a development fee to a municipal affordable housing fund pursuant to a development fee ordinance could claim similar entitlement." *Id.* at 239, 775 *A.*2d 182.

The court further noted Bi–County's reliance on this Court's statement in *Holmdel,* that " 'development fees are the functional equivalent of mandatory set-aside schemes authorized by *Mount Laurel II* and the FHA.' " *Id.* at 239–40, 775 *A.*2d 182 (quoting *Holmdel, supra,* 121 *N.J.* at 576, 583 *A.*2d 277). However, the

Appellate Division explained that that reliance was misplaced because the Court's statement was intended to explain "its conclusion that the FHA impliedly authorizes the adoption of a development fee ordinance as part of a municipal *Mount Laurel* compliance plan." *Id.* at 240, 775 *A.*2d 182 (referring to *Holmdel, supra,* 121 *N.J.* at 566–80, 583 *A.*2d 277). The Appellate Division emphasized that "the Court did not say that any developer [who] pays a development fee pursuant to such an ordinance has the same right to insist upon the elimination of any 'undue cost generating' expenses as an actual developer of lower income housing," and characterized a development for which the developer has paid a fee in lieu of constructing low income housing as a "non-inclusionary residential property." *Ibid.* (citing *Holmdel, supra,* 121 *N.J.* at 571–73, 583 *A.*2d 277). The court further stated that *Bi–County's* interpretation of *Holmdel* "distorts the Supreme Court's rationale for upholding the validity of development fees and the *Mount Laurel* doctrine." *Ibid.*

Finally, the Appellate Division found that pursuant to the Fair Housing Act, *N.J.S.A.* 52:27D–304(f), and COAH regulation *N.J.A.C.* 5:93–1.3, the designation of a residential property as an "inclusionary development" requires the construction of housing units affordable to moderate and low income households. *Id.* at 240–41, 775 *A.*2d 182. Therefore, the court concluded that Bi–County's obligation to pay into Clinton's affordable housing fund "does not transform its proposed development into an 'inclusionary development' that can assert a right to compel an adjoining municipality to allow the developer to connect into its municipal sewer system." *Id.* at 241, 775 *A.*2d 182.

This Court granted Bi–County's petition for certification. *Bi–County Development of Clinton, Inc. v. Borough of High Bridge,* 170 *N.J.* 387, 788 *A.*2d 772 (2001).

C

Subsequent to oral argument, this Court requested the New Jersey Attorney General's Office to submit an *amicus curiae* brief on behalf of COAH addressing the following questions:

1) Whether COAH considers a project to be "inclusionary" when payments are made by the developer in lieu of actually constructing affordable housing, and

2) Whether COAH views the FHA and its implementing regulations as permitting an inclusionary development to demand access to a neighboring community's water/sewer system if such access will result in substantial cost savings while presenting no public health or safety concerns to the neighboring community.

COAH responded that it considers a project to be inclusionary when payments are made by the developer in lieu of constructing affordable housing for the purposes of its administration of *Mount Laurel* obligations. However, COAH responded that it lacked the jurisdiction to decide whether an inclusionary developer in one municipality can compel another municipality to allow access to its sewer system and declined to take any position on that issue.

We also note that in April 2002, High Bridge filed a motion to dismiss the appeal. High Bridge claimed that the appeal had been rendered moot because Bi–County had sold the subject property on January 10, 2002, and that therefore Bi–County lacked standing in the litigation. Bi–County asserts that its contract of sale provides for additional compensation if it prevails in the matter at hand, and that accordingly it retains a financial stake in the litigation. The Court denied High Bridge's motion to dismiss the appeal, concluding that Bi–County's contractual right to additional compensation if it prevails prevents the sale from rendering the appeal moot.

II

A

The Legislature has authorized "municipalities and counties either separately or in combination with other municipalities and counties to finance, acquire, construct, maintain, operate or improve works for the collection, treatment, transport and disposal of sewage and to provide for the financing of these facilities." *N.J.S.A.* 40A:26A–2. Counties or municipalities are authorized to charge rates to users of the sewer services they provide as well as connection fees. *See N.J.S.A.* 40A:26A–10–11. Municipalities may impose special assessments for local improvements such as

sewage and water, *N.J.S.A.* 40:56–1, and *N.J.S.A.* 40A:26A–14 specifically provides that a governing body "shall assess the costs and expenses of the sewerage facilities on the lands specially benefited therefrom in proportion to the benefits received." However, that statutory scheme does not require a municipality to provide sewage services to anyone other than its residents and, as a general rule, a municipality that provides services for the benefit of its residents is under no obligation to extend its services to those beyond its borders. *Mongiello v. Borough of Hightstown,* 17 *N.J.* 611, 614–19, 112 *A.*2d 241 (1955).

In *Mongiello,* the Court held that the "Borough of Hightstown was under no duty to supply water from its municipal water supply system to the plaintiff, a resident of the adjoining Township of East Windsor." *Id.* at 612, 112 *A.*2d 241. The Court explained that the Legislature had expressly authorized municipalities to provide water for their inhabitants and, if they so chose, to execute contracts to provide water to non-residents. *Id.* at 615, 112 *A.*2d 241. However, a municipality is not compelled to "serve non-residents in the absence of its voluntary undertaking," *id.* at 616, 112 *A.*2d 241, and that principle applies notwithstanding the public utility aspect of the service provided. *Ibid.* (citing *Valcour v. Village of Morrisville,* 104 *Vt.* 119, 158 *A.* 83, 86–87 (Vt.1932))(recognizing town's authority to dispose of surplus electricity to non-residents but that relationship is purely contractual); *Richards v. City of Portland,* 121 *Or.* 340, 255 *P.* 326, 329 (Or.1927)(recognizing that water system was established at taxpayers' expense and "a holding that those who have not borne such burden shall have equal rights therein would not be based on sound equitable principles"). We observed in *Mongiello* that

[a] municipal water system should be so operated as to serve effectively the municipality and its residents; if non-residents can incidentally be served as an accommodation and without endangering the local service all well and good; but such incidental service to non-residents may not fairly be converted into an obligation to render additional non-resident service tending to jeopardize the service within the municipality.

[*Id.* at 618, 112 *A.*2d 241 (citation omitted).]

Bi–County relies on two cases, *Dynasty Building Corp. v. Borough of Upper Saddle River*, 267 *N.J.Super.* 611, 632 *A.*2d 544 (App.Div.1993), and *Samaritan Center, Inc. v. Borough of Englishtown*, 294 *N.J.Super.* 437, 683 *A.*2d 611 (Law Div.1996), to assert that High Bridge is obligated to provide access to its sewer system because it is required to eliminate any "undue cost generating practices" that may prevent Bi–County's development from being constructed.

After a successful builder's remedy suit was brought by the plaintiff, Dynasty Building Corporation (Dynasty), against the Borough of Upper Saddle River, the trial court entered a judgment approving a compliance plan that included the building of 119 low and moderate income housing units on Dynasty's property in Upper Saddle River. *Dynasty Building Corp., supra*, 267 *N.J.Super.* at 614, 632 *A.*2d 544. The plan contained a provision requiring the defendant-intervenor, the Borough of Ramsey (Ramsey), to " 'revise and update their intermunicipal agreement governing the providing of sewer service by Ramsey ... to accommodate Upper Saddle River's Compliance Plan consistent with the decision of the Court.' " *Ibid.* Ramsey owned the primary interest in a sewer system that served Ramsey, Allendale and a portion of Upper Saddle River. *Id.* at 615, 632 *A.*2d 544. Ramsey appealed from the judgment based on the adverse impact that the compliance plan would have on the Ramsey community, specifically the impact on its sewer system. Based on an expert's report, the trial court concluded that there was sufficient sewer capacity available to serve the Dynasty development and "other, later included, tracts." *Id.* at 616, 632 *A.*2d 544.

The Appellate Division affirmed the trial court's decision, holding that "[i]ssues of cost-bearing responsibility aside, an order requiring Ramsey to make existing sewer capacity available to *Mt. Laurel* inclusionary development sites comports with the concept that municipal obligations to provide for low and moderate income housing are established on the basis of regional responsibility." *Ibid.* (citing *Southern Burlington County N.A.A.C.P. v. Township*

*of Mount Laurel,* 92 *N.J.* 158, 208, 456 *A.*2d 390 (1983)) (*Mount Laurel II*); *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 67 *N.J.* 151, 179–80, 336 *A.*2d 713 (1975), *cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975), (*Mount Laurel I*). However, because the Appellate Division determined that Ramsey had not been afforded an opportunity to demonstrate the impact of the compliance plan on its sewer system, it remanded the issue of "whether sufficient sewer service and capacity exists to serve those inclusionary sites [that] require access to Ramsey's sewer system" for an evidentiary hearing, "followed by findings and such modifications in the compliance plan and judgment as may be necessary." *Id.* at 617.

In *Samaritan Center, Inc., supra,* 294 *N.J.Super.* at 440, 683 *A.*2d 611, the Law Division directly addressed the question whether a municipality has "any obligation to facilitate, if not assist, the development of low and moderate income housing in a neighboring municipality." One of the plaintiffs, Samaritan Center, Inc. (Samaritan), was a non-profit organization that provided housing for low-income persons in western Monmouth County. The Township of Manalapan donated public lands to Samaritan for the purpose of building eighty-seven single family homes, of which sixty-seven were restricted for low and moderate income housing needs. The other plaintiff, Tracey Station Associates, was the owner of property within the same township and had acquired development approvals arising from a final Mount Laurel Consent Order to construct 140 townhouses, of which twenty percent or twenty-eight units were reserved for low and moderate income housing. *Id.* at 441, 683 *A.*2d 611. The plaintiffs had entered into an agreement to share costs of water and sewer service to their sites located within close proximity to each other.

The plaintiffs sought a mandatory injunction compelling the defendant, the Borough of Englishtown (Englishtown), to permit access to its water and sewer lines. Specifically, the plaintiffs wanted to connect to a sewer line located about 1,700 feet from the Tracy Station property and owned and operated by Englishtown.

The Englishtown sewer line connected to the sewer lines of Western Monmouth Utilities Authority (WMUA) for "ultimate treatment at its regional facility." *Id.* at 443, 683 *A.*2d 611. The only other way for the plaintiffs to connect to the sewer service provided by WMUA was to construct a 6,200 foot connection line and negotiate various access easements. Similarly, plaintiffs sought a connection to their water supplier, Gordon's Corner Water Company, through Englishtown's backup water line. Otherwise, they would have had to connect directly to the Gordons' Corner water line by constructing another line and possibly a pumping station, "which construction [was] apparently not acceptable to the utilities authority." *Id.* at 442, 683 *A.*2d 611. Connecting to both water and sewer services through the Englishtown lines would result in an estimated cost savings of $412,888. *Id.* at 443, 683 *A.*2d 611.

The court recognized, as the plaintiffs asserted, that there was "a more significant problem than the need to simply control expenses for the housing projects." *Ibid.*. The Samaritan project was dependent on approximately $594,000 in government grants that would expire within a year if the development was not constructed. "Therefore, the remaining time, it is argued, is critical, especially if alternative easements must be obtained or a pump station constructed, over WMUA disapproval, under the non-Englishtown alternatives." *Id.* at 443–44, 683 *A.*2d 611.

The court emphasized the regional focus on meeting the low and moderate income housing need expressed in *Mount Laurel I* and *Mount Laurel II*, and stated:

> "[I]t is a virtual truism of the modern land-use canon that zoning ordinances must be regionally oriented in their provisions, prohibitions and concerns.... The insularity and parochialism of the Chinese wall theory of municipal zoning has long since been discredited."
>
> [*Id.* at 453 (quoting *Urban Farms, Inc. v. Franklin Lakes*, 179 *N.J.Super.* 203, 213, 431 *A.*2d 163 (App.Div.1981)).]

It recognized that in *Dynasty Building Corp., supra,* 267 *N.J.Super.* 611, 632 *A.*2d 544, there was a pre-existing inter-municipal

agreement for sewer service not present in the instant matter. Nevertheless, the court concluded:

> The time has come to recognize, however, that even in the absence of a pre-existing co-operation or inter-municipal agreement, each municipality, whether developing or developed, has an obligation to facilitate, if not assist, the regional goal of providing realistic housing opportunities for low and moderate income people in a cost effective manner. Everyone is a part of the region's housing solution for its most needy. That is clear in the history of the earlier cited legislative enactments, culminating in the MLUL, as confirmed by the Supreme Court in *Mount Laurel II*. That regional obligation is apparent, even if the municipality does not formally adopt zoning policies to impede such housing development in the neighboring municipality.

> This opinion does not attempt to establish the outer limits of that responsibility. That is not necessary for this matter. Suffice to say, however, that as a minimum, in this case, Englishtown has shown no credible reason for outright denying plaintiffs access to water and sewer service by connection to proximate and cost effective Englishtown lines in order to practically enhance a most important public policy concern. There is no obvious practical detriment, disadvantage or burden to Englishtown weighed against its obligation to facilitate and assist the housing need of the most needy in the region of which it is a necessary part.

> [*Id.* at 455, 683 *A.*2d at 620.]

### B

In 1975, this Court held that developing municipalities in New Jersey are constitutionally required to provide a realistic opportunity for the development of low and moderate income housing. *Mount Laurel I, supra*, 67 *N.J.* at 174, 336 *A.*2d 713. That mandate was clarified and reaffirmed in *Mount Laurel II, supra*, 92 *N.J.* 158, 456 *A.*2d 390 (1983). In *Mount Laurel II*, we also imposed an affirmative obligation on every municipality to remove unnecessary cost-producing requirements and restrictions that are "barriers to the construction of their fair share of lower income housing," specifically "zoning and subdivision restrictions and exactions that are not necessary to protect health and safety." *Id.* at 259, 456 *A.*2d 390.

We also suggested several "inclusionary zoning techniques" that municipalities could use to meet their fair share of affordable housing, including mandatory set asides and density bonuses, and encouraged municipalities and our courts to create other methods

for meeting fair share obligations. *Id.* at 265–66, 456 *A.2d* 390. "The core of [the decisions in *Mount Laurel I* and *Mount Laurel II*] is that *every* municipality, not just developing municipalities, must provide a *realistic,* not just a theoretical, opportunity for the construction of lower-income housing." *Holmdel, supra,* 121 *N.J.* at 562, 583 *A.2d* 277 (emphasis in original).

In 1985, the Legislature enacted the Fair Housing Act, *N.J.S.A.* 52:27D–301 to –329(FHA), codifying the *Mount Laurel* doctrine. In *Hills Development Company v. Township of Bernards,* 103 *N.J.* 1, 25, 510 *A.2d* 621 (1986), we upheld the constitutionality of the FHA. The FHA created COAH, the administrative agency to which the Legislature delegated the authority to define regional need for low and moderate income housing, to promulgate regulations establishing criteria and guidelines to enable municipalities to meet their fair share obligation, and the ability to decide whether a municipality's ordinances and related efforts satisfy its *Mount Laurel* obligation. We recognized that COAH's power is "extremely broad," and that "implicit throughout the entire Act, whose purpose is in part to create an agency capable of overseeing the continuing resolution of a monumental social task—is the power, in the Council, to promulgate whatever rules and regulations may be necessary to achieve its statutory task." · *Id.* at 32, 61, 510 *A.2d* 621 (citation omitted).

In attempting to comply with their *Mount Laurel* obligation, several municipalities adopted ordinances imposing developer fees as a condition for development approval. Those fees were "dedicated to an affordable—housing trust fund to be used in satisfying the municipality's *Mt. Laurel* obligation." *Holmdel, supra,* 121 *N.J.* at 556, 583 *A.2d* 277. The municipal ordinances varied in how the fees were to be imposed. Some of the ordinances imposed a mandatory fee on all new non-inclusionary developments, including commercial developments, as a condition for development approval. Two of the ordinances provided that "[n]on-inclusionary residential developers may choose between constructing the affordable housing or paying an in-lieu fee." *Id.* at 561–62, 583 *A.2d*

277. In *Fair Share Housing Center, Inc. v. Township of Cherry Hill*, 173 *N.J.* 393, 802 *A*.2d 512 (2002) also decided today, we discussed at length the rationale for our disposition in *Holmdel*.

At issue in *Holmdel* was whether development fees were a permissible device or method that municipalities could use in meeting their fair share obligation. *Id.* at 573, 583 *A*.2d 277. We held that they were permissible. The Court noted that although the FHA did not expressly authorize municipalities to impose developer fees, the statute does provide "a broad range of general powers" to municipalities to implement any technique to provide its fair share of low income housing. *Ibid.* Therefore, "[s]uch measures do not offend the zoning laws or the police powers." *Ibid.* We also stated that it "is fair and reasonable to impose such fee requirements on private developers when they possess, enjoy, and consume land, which constitutes the primary resource for housing." *Ibid.* (citing *Mt. Laurel II, supra*, 92 *N.J.* at 274, 456 *A*.2d 390).

In that context we found that developer fees were among the types of devices or methods that we encouraged municipalities to consider in *Mount Laurel II*, in addition to mandatory set asides and density bonuses, to meet their fair share obligations. *Id.* at 563, 583 A.2d 277 (citing *Mount Laurel II, supra*, 92 *N.J.* at 265–66, 456 *A*.2d 390). Accordingly, we requested that "COAH, through its rulemaking procedures, [ ] specify standards for development fees, so that municipalities may consider using such fees in designing their housing element and fair share plans." *Id.* at 579, 583 *A*.2d 277. In response, COAH promulgated regulations regarding residential development fees, *N.J.A.C.* 5:93–8.10, and non-residential development fees, *N.J.A.C.* 5:93–8.11. *N.J.A.C.* 5:93–8.11 authorizes municipalities to impose such fees on commercial developers. *N.J.A.C.* 5:93–8.10(a) and (b) permit the imposition of such fees on non-inclusionary residential developers.

Pertinent to our discussion is *N.J.A.C.* 5:93–8.10(c), which authorizes the imposition of development fees on owners of sites zoned for inclusionary development and provides that

*[m]unicipalities may allow developers of sites zoned for inclusionary development to pay a fee in lieu of building low and moderate income units,* provided the Council determines the municipal housing element and fair share plan provides a realistic opportunity for addressing the municipal fair share obligation. The fee may equal the cost of subsidizing the low and moderate income units that are replaced by the development fee. For example, an inclusionary development may include a 20 percent set-aside, no set-aside and a fee that is the equivalent of a 20 percent set aside or a combination of a fee and set-aside that is the equivalent of a 20 percent set-aside.

[Emphasis added.]

In addition, *N.J.A.C.* 5:93–8.16 addresses certain limitations and guidelines with regard to how development fees are to be expended, and *N.J.A.C.* 5:93–5.1(c) requires municipalities to prepare development fee spending plans specifying, among other things, "a description of the anticipated use of [such fees]," and a "schedule for the creation or rehabilitation of housing units." Furthermore, *N.J.A.C.* 5:93–8.2 provides that "[n]o municipality shall spend development fees unless the Council has approved a plan for spending such fees," and *N.J.A.C.* 5:93–8.19 imposes penalties on municipalities that fail to submit spending plans for approval or fail to implement the plan to spend development fees within time limits and deadlines set by COAH. Although COAH approved Clinton's mandatory developer fee Ordinance in March of 1993, Clinton did not create a spending plan until it applied for its second round petition for substantive certification on December 15, 2000. COAH approved that spending plan in February 2001.

Relying on *Holmdel,* Bi–County argues that its development qualifies as an inclusionary development entitled to all of the benefits afforded inclusionary developers, citing to COAH's interpretation of the FHA as well as COAH's own regulations concerning developers fees. The FHA defines an " 'inclusionary development' as a residential housing development in which a substantial percentage of the housing units are provided for a reasonable income range of low and moderate income households." *N.J.S.A.* 52:27D–304(f). COAH's regulations define an "inclusionary development" as

a development containing low and moderate income units. This term includes, but is not necessarily limited to, new construction, the conversion of a non-residential

structure to a residential structure and the creation of new low and moderate income units through the gut rehabilitation of a vacant residential structure. [*N.J.A.C.* 5:93–1.3.]

COAH's cost-generating regulations provide that pursuant to the FHA, the elimination of "unnecessary cost generating features from municipal land use ordinances" for *"inclusionary development applications"* is a requirement of substantive certification:

In order to receive and retain substantive certification, *municipalities shall eliminate development standards that are not essential to protect the public welfare and to expedite (or "fast track") municipal approvals/denials on inclusionary development applications.*

... the focus shall be whether the design of the inclusionary development is consistent with the zoning ordinance and the mandate of the Fair Housing Act regarding unnecessary cost generating features. Municipalities shall be expected to cooperate with developers of inclusionary developments in granting reasonable variances necessary to construct the inclusionary development.

[*N.J.A.C.* 5:93–10.1 (emphasis added).]

*N.J.A.C.* 5:93–10.2 identifies what COAH regards as potential cost-generating features of the zoning ordinance of a municipality seeking COAH certification, and provides that [i]n its review of municipal ordinances, the Council shall give special attention to:

1. The combined impact of requirements that cumulatively prevent an inclusionary development from achieving the density and set-aside necessary to address the municipal fair share. Examples of such requirements include but are not limited to: building set-backs, spacing between buildings, impervious surface requirements and open space requirements;

2. Requirements to provide oversize water and sewer mains to accommodate future development without a reasonable prospect for reimbursement;

3. Excessive road width, pavement specifications and parking requirements;

4. Excessive requirements for sidewalks and paved paths;

5. Excessive culvert and pumping station requirements; and

6. Excessive landscape, buffering and reforestation requirements.

In the "Comment and Response" period following the publication of the proposed amendments to *N.J.A.C.* 5:93–10, COAH suggested that the benefits of that rule also were available to developers who paid in-lieu fees.

COMMENT 279: The relief available under subchapter 10 should be available to all developers who participate in a housing plan, not just inclusionary developers with low and moderate income units on their properties. There is no reason for

excluding developers who have agreed to pay a contribution rather than actually constructing low and moderate income housing units.

RESPONSE: Developers that are paying a fee that is the equivalent of a low or moderate income unit are entitled to the relief discussed in subchapter 10.

[25 *N.J.R.* 5782, Comment 279, Dec. 20, 1993.]

Thus, although COAH's own regulatory definition of inclusionary development does *not* include developers who pay a fee in lieu of constructing affordable housing, COAH asserts that such developers nevertheless are entitled to the benefits of the protections against unnecessary cost generating features contained in COAH's regulations. We recognize the principle of judicial deference accorded COAH as an administrative agency, and its broad powers in implementing the Mount Laurel doctrine and the goals of the FHA. See *In re Warren Township*, 132 *N.J.* 1, 26–27, 622 *A.*2d 1257 (1993). We also recognize that we have had occasion to invalidate COAH's exercise of its regulatory power under the FHA. *Id.* at 31, 622 *A.*2d 1257. However, COAH concedes that it lacks jurisdiction to decide whether an inclusionary developer in one municipality can compel another municipality to allow access to its sewer infrastructure and capacity. COAH's cost generation regulations, as COAH recognizes in its brief, "do not expressly deal with the claimed cost-generating practices of contiguous municipalities or sewer authorities outside the Council's jurisdiction. To the contrary, only the cost-generating features of municipal ordinances of the municipality that has a fair share plan under review by the Council are the focus of these rules which are drafted under the authority of *N.J.S.A.* 52:27D–314(b)."

COAH regulations on their face apply to the cost generating restrictions only of the municipality seeking substantive certification. The benefit of cost avoidance relates to ordinances within the municipality where the inclusionary site is located. COAH asserts that "inclusionary developments," including developments for which the developer pays a fee in lieu of constructing affordable housing, are entitled to relief from such restrictions. But COAH acknowledges that it lacks statutory authorization to grant

relief from cost generating restrictions imposed by a neighboring municipality.

Accordingly, we need not resolve in this appeal whether the Bi-County development is an inclusionary development for purposes of benefiting from COAH's cost generating regulations. We acknowledge that COAH already has made that determination. But because COAH's restrictions on cost generating local ordinances expressly apply, for Bi-County's purposes, only to Clinton Township and, as COAH concedes, are of no force and effect with regard to High Bridge, those restrictions do not assist us in resolving the issue at the root of this appeal.

### III

In *Dynasty Building Corp.* the Appellate Division relied on the notion of regional responsibility set forth in the *Mount Laurel* decisions to make an exception to the general rule and require that a town's sewer system accommodate an inclusionary development in a neighboring town. In *Dynasty*, however, an inter-municipal agreement already existed requiring that Ramsey's sewer system serve portions of Upper Saddle River. Moreover, the inclusionary development actually included low and moderate income housing.

*Samaritan's* expansion of that doctrine required a municipality, even in the absence of an inter-municipal agreement, to permit an inclusionary development located in a neighboring town to gain access to its sewer system. A non-profit organization, Samaritan's development of low and moderate income houses was vital in fulfilling the public policy mandate to increase the supply of affordable housing. Sewer access was essential for Samaritan's project to go forward. Those circumstances in part explain the court's grant of an exception to the general rule that residents in one municipality have no right to compel a connection to a neighboring municipality's sewer system.

We find the rationale underlying *Samaritan* to be consistent with our holdings in *Mount Laurel I* and *Mount Laurel II*.

However, we decline to extend that rationale to Bi–County. In contrast to *Samaritan,* Bi–County is not building low and moderate income housing. In addition, the success of Bi–County's proposed development is not at stake. Bi–County has alternative means of acquiring sewer service that require it to extend a sewer line along Route 31. Although more expensive than connecting into High Bridge's system, that alternative was Bi–County's plan when the development was granted initial subdivision approval. In fact, Bi–County instituted suit to gain the sewer capacity that was essential to execution of that alternative sewer plan. After years of negotiation and mediation, Bi–County had a change of heart and elected to try to avoid the cost of constructing the extension by connecting to High Bridge's system. As the Appellate Division recognized, "compelling High Bridge to allow Bi–County to connect into High Bridge's sewer system would not facilitate the construction of lower income housing. It would only lower the costs and thereby increase the potential profits from a development of single family homes and a commercial building." *Bi–County, supra,* 341 *N.J.Super.* at 237, 775 *A.*2d 182.

We acknowledge that development fees may provide significant assistance to municipalities in satisfying their fair share obligation, helping to finance regional contribution agreements and rehabilitation programs. Payment of such fees into a municipality's fair share fund potentially may contribute in the future to the actual construction of low income housing within the municipality. However, in our view the payment of a development fee, either by commercial developers, non-inclusionary residential developers, or by the owners of inclusionary residential sites in the form of in lieu payments, does not have a sufficient nexus to the actual production of low income housing to justify infringing on another municipality's right to restrict access to its sewer system. The connection between payment of a development fee and construction of affordable housing may be substantial in some cases, or remote and insignificant in others, depending on COAH's implementation of its regulations and on a specific municipality's use of development fees. As noted, Clinton Township did not create a

spending plan until February 2001, eight years after COAH approved its mandatory developer fee ordinance and almost seven years after the Bi–County development was granted preliminary subdivision approval. Notwithstanding the potential value of development fees, we decline to elevate Bi–County's status to equal that of Samaritan, a non-profit builder of low income housing whose entire project could have failed without access to water and sewer capacity from a neighboring municipality.

■ Compelling circumstances should exist in order to justify, under Mount Laurel principles, disturbing the general rule that a municipality may exclude another municipality or its residents from using or connecting to its sewer system. We anticipate that general rule will be disturbed only in the case of developments that substantially and directly serve important regional and environmental interests. The Bi–County development is not in that category.

We imply no view on the soundness of the underlying legislative scheme that authorizes municipalities to finance and construct their own sewer systems for the exclusive use of property owners in the respective municipality. The question whether in special circumstances municipalities should be encouraged, or even required, to make available sewer capacity to property owners in adjacent communities, assuming adequate compensation is paid to the sewered municipality, is for the Legislature. We infer that on occasion such arrangements are negotiated voluntarily.

IV

As modified, we affirm the judgment of the Appellate Division.

VERNIERO, J., dissenting.

The Court holds that Bi–County, a developer that has agreed to pay up to $374,000 toward the construction of low- and moderate-income housing units, cannot connect to High Bridge's sewer line. In so doing, it forces Bi–County to spend in excess of $600,000 on

an alternative sewer connection without any determination concerning whether the connection to High Bridge's sewer system would place a burden on that system or on the municipality's taxpayers. More significant than requiring the needless expenditure of funds by this one developer, the Court's holding limits a municipality's flexibility in addressing its *Mount Laurel* obligations. I respectfully dissent.

The critical element of our *Mount Laurel* jurisprudence is that municipalities must undertake an affirmative act to make it *"realistically* possible for lower income housing to be built." *S. Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 92 *N.J.* 158, 261, 456 *A.*2d 390 (1983) (*Mount Laurel II*). This Court consistently has encouraged creativity in the ways in which municipalities can meet their affordable housing obligations. Eschewing rigid mandates, we have stated:

> There are several inclusionary zoning techniques that municipalities must use if they cannot otherwise assure the construction of their fair share of lower income housing. Although we will discuss some of them here, we in no way intend our list to be exhaustive; *municipalities and trial courts are encouraged to create other devices and methods for meeting fair share obligations.*
>
> [*Id.* at 265–66, 456 *A.*2d 390 (emphasis added) (footnote omitted).]

One permissible method is the "in-lieu development fee" that is "expressly dedicated to lower-income housing." *Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 569, 573, 583 *A.*2d 277 (1990). In *Holmdel,* we stated that because such fees "are conducive to the creation of a realistic opportunity for the development of affordable housing[,]" they generally would satisfy a municipality's fair share obligation. *Id.* at 573, 583 *A.*2d 277. The Court also noted that "development fees are the functional equivalent of mandatory set-asides[.]" *Ibid.* (Mandatory set-asides require a developer to sell or rent a certain percentage of housing units at below their full value so that the units are affordable to lower-income households. *Mount Laurel II, supra,* 92 *N.J.* at 269, 456 *A.*2d 390.)

Additionally, if a development is deemed to be "inclusionary," then that development is accorded certain protections established

by regulations promulgated under the Fair Housing Act, *N.J.S.A.* 52:27D–301 to –329(FHA). Most relevant here is the protection from "cost-generating" practices of municipalities that serve to preclude the creation of affordable housing. *See N.J.A.C.* 5:93–10.1(a); –10.1(b); –10.2(a). Along those lines, the court in *Samaritan Center, Inc. v. Borough of Englishtown* held that the inclusionary developer in that case was entitled to connect to a neighboring municipality's sewer system. 294 *N.J.Super.* 437, 461, 683 *A.*2d 611 (Law Div.1996). The court grounded its holding in the belief that providing affordable housing in a cost-effective manner is a "regional" responsibility. *Id.* at 455, 683 *A.*2d 611. The court concluded that a neighboring municipality should allow access to its sewer system when "[t]here is no obvious practical detriment, disadvantage or burden to [the neighboring municipality] weighed against its obligation to facilitate and assist the housing need of the most needy in the region of which it is a necessary part." *Ibid.* (footnote omitted).

I am persuaded that the principles articulated in *Samaritan* ought to apply to the Bi–County development. In its brief submitted at our invitation, the Council on Affordable Housing (COAH or Council) makes clear that Bi–County is the equivalent of an inclusionary developer. COAH concludes: "Bi–County's obligated payments *in lieu* of construction of affordable housing entitles it to the same special status as would otherwise be afforded to any other 'inclusionary development.'" (The in lieu development fee described by COAH under *N.J.A.C.* 5:93–8.10(c) and entitling developers to certain protections is not to be confused with "residential development fees" set forth under *N.J.A.C.* 5:93–8.10(a).) Consistent with COAH's conclusion, the development fee that Bi–County agreed to pay to Clinton is dedicated specifically to lower-income housing. The agreement between the parties states explicitly that Bi–County's "[c]ontribution in lieu of an on-site set aside, ... shall be used by the Township solely for the creation of a realistic housing opportunity for low and moderate income households[.]"

Further, COAH's brief expresses that agency's strong embrace of in-lieu development fees:

The COAH policy equating sites that produce in-lieu development fees with inclusionary sites that produce housing on site is important because it provides the flexibility needed by municipalities, the Council and the courts to settle *Mount Laurel* disputes.... The in-lieu fees provide a necessary source of funding for municipalities to pursue other less intrusive methods of achieving *Mount Laurel* obligations. Under the FHA, municipalities are not obligated to expend their own revenues for purposes of achieving *Mount Laurel* compliance. *N.J.S.A.* 52:27D-311(d). Therefore, money to finance approved affordable housing techniques, such as Regional Contribution Agreements (*N.J.S.A.* 52:27D-312; *N.J.A.C.* 5:93-6.1 *et seq.*), rehabilitation programs (*N.J.A.C.* 5:93-5.2), accessory apartments (*N.J.A.C.* 5:93-5.9) or write down/buy down units (*N.J.A.C.* 5:93-5.1), must come through development fees. Because the payment of an in-lieu development fee is generally greater than the payment of a standard maximum development fee and because the payment of an in-lieu development fee is generally equivalent to the internal subsidization required to provide a unit of affordable housing within an inclusionary development, the Council believes that developers that pay in-lieu fees should receive the same status as inclusionary developers in the COAH process. Accordingly, the Council has historically treated sites that pay in-lieu fees as the equivalent of inclusionary sites where units are built on-site.

We should defer to COAH's policy pronouncements. *Holmdel, supra,* 121 *N.J.* at 577, 583 *A.*2d 277 (observing that "breadth of the legislative mandate and the statutory standards creating COAH's regulatory authority comport with the complexity and sensitivity of the subject of affordable housing"). In evaluating that policy here, I recognize that COAH's existing regulations do not specifically address the issue at hand. Nonetheless, COAH's wide acceptance of in-lieu development fees furnishes the basis on which to apply *Samaritan* to the present dispute. High Bridge is necessarily a part of Hunterdon County that includes Clinton. Based on *Samaritan's* rationale, High Bridge has a regional obligation to assist in a neighboring inclusionary development so long as such assistance presents no detriment or burden to High Bridge or to its taxpayers. Within that framework, I would consider High Bridge's refusal to allow the Bi-County connection to be a "cost-generative" practice that has no practical utility, unless a further-developed record proves otherwise.

The majority reaches a contrary conclusion by distinguishing *Samaritan's* facts from the facts here. Specifically, the majority

observes that Bi–County is not a "non-profit builder of low income housing whose entire project could have failed without access to water and sewer capacity from a neighboring municipality." *Ante* at 328, (174 *A*.2d at 301). Rather, Bi–County is a for-profit developer that will pay a fee in lieu of setting aside affordable units, and is not encumbered by the time constraints that were present in *Samaritan*. *Id.* at 319, (174 *A*.2d at 301).

Those distinctions, in my view, serve only to create a hierarchy of inclusionary developers and to further complicate an already complicated field of law. Moreover, the notion of segregating developers that otherwise have acquired inclusionary status runs contrary to *Mount Laurel II*, *supra*, in which, I repeat, the Court encouraged towns to be creative in designing "devices and methods for meeting fair share obligations." 92 *N.J.* at 266, 456 *A*.2d 390. The Court should not care whether Bi–County itself builds the affordable housing units or whether it finances their construction, so long as the units are built in furtherance of *Mount Laurel's* objectives. *Holmdel*, *supra*, 121 *N.J.* at 573, 583 *A*.2d 277. Nor should the Court construe the general rule of municipal autonomy announced in *Mongiello v. Borough of Hightstown*, 17 *N.J.* 611, 614–19, 112 *A*.2d 241 (1955), to limit the options of developers and towns that attempt in good faith to comply with the *Mount Laurel* mandate.

In a sound, straightforward decision, the trial court concluded that Bi–County's inclusionary status entitled it to the same protections as other inclusionary developers. That court also determined that forcing Bi–County to spend fifty times more than what it otherwise would have spent on sewer connections is unnecessary. I agree. Accordingly, I would permit Bi–County to connect to the High Bridge system so long as that connection does not burden that system or otherwise affect High Bridge's current or future needs. I would remand for a full hearing to explore those issues. Such a disposition, in my view, is more in keeping with this Court's prior jurisprudence and the policy that underlies the in-lieu development fee as articulated by COAH.

The judgment of the Appellate Division should be reversed.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice PORITZ, and Justices STEIN, COLEMAN, LaVECCHIA, and ZAZZALI—5.

*For reversal*—Justices LONG and VERNIERO—2.